857 So.2d 384 (2003)
Susan Diane Starks ROSS
v.
Billy Wayne ROSS.
No. 2002-C-2984.
Supreme Court of Louisiana.
October 21, 2003.
*385 Walter George Bayhi, Baton Rouge, Counsel for Applicant.
Mark V. Marinoff, Frank J. Saia, Counsel for Respondent.
JOHNSON, Justice.
We are called upon to determine whether renewal commissions received by the ex-husband during the marriage on insurance policies issued prior to the marriage were the ex-husband's separate property subject to his declaration of paraphernality. The trial court and court of appeal found that the renewal commissions were separate property. We granted the ex-wife's writ of certiorari to determine the correctness of the lower courts' rulings. For the reasons that follow, we conclude that effort, skill, and industry were exerted to obtain the renewals, and we reverse the lower courts' rulings.

FACTS AND PROCEDURAL HISTORY
Mr. Billy Wayne Ross (Mr. Ross) and Ms. Susan Diane Starks Ross (Ms. Starks)[1] were married on May 29, 1992. Mr. Ross has been an independent insurance agent with State Farm since 1963 and operates the Billy Ross Agency in Baton Rouge, Louisiana. Shortly after their marriage, Mr. Ross filed a declaration of paraphernality on July 10, 1992, wherein he declared:
that in accordance with the provisions of Article 2339 of the Civil Code of *386 Louisiana, as amended by Act 709 of 1979, he reserves all fruits of his paraphernal and separate property, wherever located and however administered, whether such fruits be natural and civil, including interest, dividends and rents, bonuses, royalties, delay rentals and shut-in payments arising from mineral leases on separate property, or from the result of labor, or otherwise, for his own separate use and benefit and that it is his intention to administer such property separately and alone.
In the declaration, Mr. Ross acknowledged that a regime of acquets and gains otherwise existed between him and his wife.
Ms. Starks filed for divorce on November 18, 1996 and a judgment of divorce was rendered on June 11, 1997. Ms. Starks subsequently filed a petition to partition community property on November 6, 1997 in which she asserted that Mr. Ross had used community funds to satisfy his separate debts. In his answer, Mr. Ross claimed that the income in question, which he received from his insurance business, was his separate property subject to the declaration of paraphernality.
The trial court held a hearing on the single issue of whether the income derived from Mr. Ross' insurance agency was his separate property and thus subject to the declaration of paraphernality. Following the hearing, the trial court rendered judgment, finding that any and all renewal commissions for policies originally issued before the date of marriage and received by Mr. Ross prior to or during the marriage are classified as his separate, paraphernal property. The court also found that Ms. Starks bore the burden of proving any entitlement to a pro rata share of renewals received by Mr. Ross between the date of the marriage and the filing of the declaration of paraphernality. The court further concluded that any income generated from new polices issued during the marital regime, as well as any renewal commissions derived therefrom are deemed to be community property.
In extensive written reasons for judgment, the trial court relied on jurisprudence that has held that renewal commissions received after the termination of the community as a result of the sale of insurance policies during the existence of the community are community property. Futch v. Futch, 26-149 (La.App. 2 Cir. 9/23/94), 643 So.2d 364; Michel v. Michel, 484 So.2d 829 (La.App. 1 Cir.1986); Boyle v. Boyle, 459 So.2d 735 (La.App. 4 Cir. 1984). The court then reasoned that income generated from policies issued prior to the establishment of the community were Mr. Ross' separate property. Based on Mr. Ross' declaration of paraphernality, the trial court held that the renewal commissions generated from those policies issued prior to the establishment of the matrimonial regime were also Mr. Ross' separate property. The court further found that the effort, skill and industry which ultimately produced the renewals was performed by Mr. Ross prior to the marriage which rendered them to be his separate property. Addressing Ms. Starks' argument that no "thing" exists from which fruits may be produced, the trial court concluded that the "thing" or "asset" from which civil fruits derived were the actual policies of insurance written by Mr. Ross.
The court of appeal affirmed the trial court's ruling in a 2-1 decision. The majority concluded that "Mr. Ross received renewal commissions based on his contract with State Farm and renewals of pre-existing insurance policies, and since both the contract and the insurance policies are juridical acts, we find no error in the trial court's determination that the policies are things or assets from which civil fruits may *387 be derived." Ross v. Ross, 01-2691 (La. App. 1 Cir. 11/8/02), 835 So.2d 817, 820.
The court of appeal disagreed with Ms. Starks' contention that the renewal commissions should be deemed Mr. Ross' salary because the majority, if not all of his income, is attributable to the renewal commissions. The court cited Kyson v. Kyson, 596 So.2d 1308 (La.App. 2 Cir.1991) (on re'g), writ denied, 599 So.2d 314 (La.1992); Gautreau v. Gautreau, 96-1548, 697 So.2d 1339 (La.App. 3 Cir. 6/18/97); and Paxton v. Bramlette, 228 So.2d 161 (La.App. 3 Cir.1969) writ denied, 255 La. 241, 230 So.2d 92 (La.1970) for the proposition that in order to disprove that the renewal commissions received by Mr. Ross were not civil fruits, it was necessary for Ms. Starks to prove that substantial labor was exerted by Mr. Ross to obtain the renewal commissions during the existence of the community property regime.
The court of appeal further found that:
[h]ad the trial court found that Mr. Ross had expended any significant effort skill or industry in effecting the renewal of policies pre-existing the community during the existence of the community property regime, then the commissions would constitute community property and be subject to a claim of partition, to the extent or percentage community labor or "effort skill and industry was attributable to the renewal so effected."
Ross v. Ross, 835 So.2d at 821
The appellate court further found that "[a]lthough Mr. Ross may have listed the renewal commissions as income on his tax statements and such income comprised a disproportionate share of his total income, the evidence shows that Mr. Ross received this income as a result of little or no effort, skill or industry exerted on his part during the community." Id. at 821.
Judge Pettigrew dissented, stating:
Mr. Ross had no ownership interest in the insurance policies that renewed during the existence of the community of acquets and gains between him and his former wife. In my humble opinion, the commissions earned on these renewal premiums fit no description of separate property or asset that produces natural or civil fruits as utilized in La. Civ.Code art. 2339.

* * *
Premiums earned during the community of acquets and gains on renewal policies are nothing more than wages or compensation earned during the community of acquets and gains and are therefore community property.

DISCUSSION
Civil Fruits
The only issue before this court is whether the renewal commissions received by Mr. Ross during the community property regime on insurance policies written before the existence of the community are the result of labor, skill or industry, and are, thus, community property or whether, on the other hand, the renewal commissions are the "civil fruit" of some asset acquired by Mr. Ross prior to the existence of the community, such that they are subject to his declaration of paraphernality. We are called upon to determine, in other words, whether the renewal policies are "property" from which Mr. Ross may derive such civil fruits.
We begin our discussion with a historical background of the concept of "fruits" in Louisiana as well as the rights of spouses with regard to fruits under the Louisiana community property regime.
Professor A.N. Yiannopoulos in his discussion of the notion of fruits and products in Louisiana and comparative law describes *388 the basic principle of fruits and products as follows:
Certain things are capable of producing other things, namely, corporeal objects or incorporeal economic advantages. In Louisiana and in France, the things that are produced by another thing without diminution of its substance are termed fruits. The fruit-producing thing is often termed a principal thing. Things produced by another thing whose substance is thereby diminished are termed products. (Emphasis by author)
Yiannopoulos, Property § 37, Louisiana Civil Law Treatise (4th ed.2001).
In a comparison with Roman law, Yiannopoulos notes that under classical Roman law, fruits were, generally, the products derived from a thing regardless of diminution of its economic value. Yiannopoulos, supra, at § 38.[2] Distinction was made between natural and civil fruits. Ordinarily, natural fruits were corporeal objects while civil fruits were values resulting from the ownership of a thing or from the conduct of business. Id. Also under Roman law, fruits followed the juridical situation of the principal thing in all cases. The owner of a thing ordinarily acquired its fruits. It was only in exceptional cases that other personsa lessee, for instance, or usufructuary, or a bona fide possessor, acquired them. Id.
In discussing the French Code, Professor Yiannopoulos notes:
The French Civil Code does not define the generic term fruits. The definition accepted by courts and writers is that fruits are things that are produced periodically from a principal thing without diminution of its substance. (Citations omitted). Things produced by, or derived from, another thing whose substance is thereby diminished are not fruits but products (produits). Once separated from the principal thing, products are not reproduced.
According to Yiannopoulos, the significance of the distinction between fruits and products is that it provides the standard for the apportionment of economic advantages between the owner of a thing and other persons entitled to its fruits. "The owner is entitled to all products, whereas persons entitled to fruits only receive revenues produced by a thing periodically without diminution of its substance." Yiannopoulos at § 39. He further explains that under French law ordinarily, fruits as well as products, follow the juridical situation of the principal thing. The owner of the principal thing acquires, upon separation, the ownership of fruits and products as individual things. However, "[i]n certain circumstances, principal things and fruits are disassociated; their juridical situation is not the same. In these circumstances, fruits do not follow the ownership of the principal thing, though products still do. Thus, when a usufruct is established, the fruits belong to the usufructuary, but products ordinarily belong to the naked owner." Id. (Emphasis added).
In interpreting the corresponding provisions of the Louisiana Civil Code of 1870 in this area, Yiannopoulos notes that Louisiana frequently followed French doctrine and jurisprudence. The terminological distinction between "fruits" and "products," however, was not at first accepted. As a result, a different conceptual apparatus had to be employed for the apportionment of economic advantages between the owner of a thing and other persons entitled to "fruits" such as usufructuaries, possessors in good faith, or as spouses living under the regime of community property. *389 However, Article 551 of the Louisiana Civil Code established a unitary notion of fruits for all purposes, and following the French doctrine, the 1979 legislation has adopted the distinction between "fruits" and "products."[3]
The Louisiana Code of 1870 established three categories of fruits, namely, natural fruits, fruits of industry, and civil fruits. La. C.C. art. 545 (1870).[4] Fruits of industry differed from natural fruits in that they were the result of effort and industry, whereas natural fruits were the spontaneous product of the earth or of animals. Since the rules governing natural fruits and fruits of industry have always been the same, the two categories were combined in the 1976 codal revision into one. See. La. C.C. art 551 (Acts 1976, No. 103, § 1, eff. Jan. 1-1977). Louisiana Civil Law Treatise; Property; Yiannopoulos.
Prior to the effective date of article 551, the jurisprudence, as well as doctrinal materials, indicated "fruits" was construed according to the context in which the issue of classification arose. Succession of Doll, 593 So.2d 1239, 1244, 1245 (La.1992). Citing Gueno v. Medlenka, 238 La. 1081, 117 So.2d 817 (1960) (usufruct); Milling v. Collector of Revenue, 220 La. 773, 57 So.2d 679 (1952) (taxation); Harang v. Bowie Lumber Co., 145 La. 96, 81 So. 769 (1919) (good faith possession); Elder v. Ellerbe, 135 La. 990, 66 So. 337 (1914) (good faith possession). Finally, a unitary notion of fruits ensued with the enactment of article 551.
As it relates to the mode of acquisition of fruits, Yiannopoulos states:
According to civilian conceptions, nonsepar[a]ted fruits form a part of the fruit-producing thing and belong to the owner of that thing by right of accession. Upon separation, natural fruits become individual things, and question arises as to how the ownership of these things are acquired. Owners, good faith possessors, and persons having real rights in fruit-producing things acquire ownership of natural fruits upon separation, without the need of any act on their part. Persons having real rights acquire ownership of natural fruits by virtue of an act of collection, namely by the taking of possession.

The mode of acquisition of civil fruits involves distinct problems. According to traditional civilian ideas, maintained in modern codes, civil fruits accrue by virtue of an obligation; hence one entitled to civil fruits acquires a "claim" for the collection of civil fruits rather than "ownership" thereof. Accordingly, the mode of acquisition of civil fruits is ordinarily a matter governed by the agreement of the parties and the law of obligations. (Emphasis added)
Yiannopoulos, supra, § 41.
With regard to the classification of property among married persons, the legal principles are found the Louisiana Civil Code. La. C.C. art. 2338 provides:
The community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property *390 acquired with community things or with community and separate things, unless classified as separate under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property.
As was explained in 16 Spaht and L.W. Hargrave, Louisiana Civil Law Treatise, Matrimonial Regimes § 3.3 at 48(1997):
Wages are the premier community asset. It is wages paid in return for work done during the existence of the community that are included, regardless of when the payment is actually made. The "property acquired," in the language of Louisiana Civil Code Article 2338, is a right to payment at some point for the work done. If payment is made during the community for work done before its commencement, the money is separate. If the check is cut after termination, but is for work done during the community, the funds are community.
Property acquired by a spouse prior to the establishment of the community property regime is separate property. La. C.C. art. 2341. However, the natural and civil fruits of separate property produced during the existence of the community property regime are community unless a spouse reserves them as his separate property in a declaration made by authentic act or an act under private signature duly acknowledged. La. C.C. art. 2339.
The Code also provides that things in the possession of a spouse during the existence of a regime of acquets and gains are presumed to be community. La. C.C. art. 2340. However, either spouse may rebut this presumption. La. C.C. art. 2340. The spouse seeking to rebut the presumption bears the burden of proving that the property is separate in nature. Knighten v. Knighten, 00-1662 (La.App. 1 Cir. 9/28/01), 809 So.2d 324, writ denied, 01-2846 (La.1/4/02), 805 So.2d 207.
The current definition of fruits is found in La. C.C. art. 551, which provides:
Fruits are things that are produced by or derived from another thing without diminution of its substance.
There are two kinds of fruits; natural and civil fruits.
Natural fruits are products of the earth or of animal.
Civil fruits are revenues derived from a thing by operation of law or by reason of juridical act, such as rentals, interest, and certain corporate distributions.
Is there a fruit producing "thing" or "asset?"
With this background, we will now address Ms. Starks' first argument that the lower courts erred in finding that the insurance policies between State Farm and the individual policy holders constitutes "things" or assets from which fruits may be produced.
Ms. Starks argues that neither the insurance policies written by Mr. Ross prior to the marriage nor his agency contract with State Farm Insurance Company (the agency contract) constitute "things" or "assets" in which Mr. Ross had an ownership interest and from which fruits may be derived. Without any ownership interest, Ms. Starks argues, the agency contract is no different in function than a medical license, a law license, or an exclusive franchise agreement. She maintains that like these examples, the agency contract has no inherent value, cannot be inherited by children or transferred for value to a third person, and returns nothing on the "investment" required to acquire it.
*391 Ms. Starks further maintains that the individual insurance policies sold to the customers prior to the marriage did not create "property" because Mr. Ross had no legal interest in those policies. Only the policyholders or State Farm could enforce, cancel, renew, modify, or avail themselves of the provisions of those policies. Mr. Ross could not transfer or assign the policies themselves, and his ability to collect premiums from the renewal of the policies is conditioned upon his possession of a valid Louisiana insurance license, the continuation of the State Farm Agency Contract, the decision of the policyholder to renew the policy, and the payment of the premiums. Thus, according to Ms. Starks, the renewal commissions could not have been classified as fruits.
Mr. Ross counters that the lower courts correctly determined that the insurance policies entered into between the policy holders and State Farm were "things" in themselves. He argues that although the policies themselves did not create property rights per se, they were things themselves which produced revenue by juridical act (the state Farm Agency contract with Mr. Ross). Mr. Ross contends that the renewals flowing from the things in question (the insurance policies) produced civil fruits (renewal commissions). As the policies were sold prior to the marriage, Mr. Ross argues that the lower courts correctly concluded that the civil fruits inured to his separate estate and could be reserved under article 2339.
After careful review of the law, we must agree with the court of appeal's finding that the individual policies of insurance are "juridical acts" from which civil fruits may be derived. As stated, the definition of "civil fruits" contained in La. C.C. art. 551 is "revenues derived from a thing by operation of law or by reason of juridical act."[5] (Emphasis added). Examples given of civil fruits include rent, interest and some corporate distributions. To qualify as a "fruit," a thing must first be "produced by or derived from" another thing. La. C.C. art. 551. Thus, the examples of "civil fruits" provided in the code must necessarily be derived from a "thing" or "asset," i.e. rental property, money, or some corporate investment.
We reject Ms. Starks' argument that not only must there be a "thing," there must be an ownership interest in the thing in order to claim ownership of the civil fruits. There is no dispute that Mr. Ross has no ownership interest in the insurance policies per se as he has no direct, immediate or exclusive authority over these contracts. Further, he cannot transfer, enjoy, or dispose of these contracts.
However, the record indicates that Mr. Ross received commissions based on his agency contract with State Farm coupled with the securing of the individual insurance policies. By virtue of these juridical acts, Mr. Ross gained "the right" to collect or a "claim" to the insurance commissions on these policies. As long as these same policies of insurance are renewed, Mr. Ross has the same "right" or "claim" to the commissions. Thus, under the definition of civil fruits contained in La. C.C. art. 551, Mr. Ross received revenue (renewal commission) by reason of juridical acts (the insurance policies). As explained above, fruits do not always follow *392 the ownership of the principal thing, as is the case with products. As stated by Yiannopoulos, the mode of acquisition of civil fruits is ordinarily a matter governed by the agreement of the parties and the law of obligations.
Fruits or Earnings?
Having decided that the insurance policies are "things" from which civil fruits may be derived, we must now determine whether the lower courts erred in finding that the renewal commissions were in fact "civil fruits" of Mr. Ross' separate property, and not the result of Mr. Ross' effort, skill or industry during the existence of the community property regime. As evidenced in the instant case, our courts have experienced some difficulty in determining whether a spouse's property should be classified as earnings or fruits.
Spaht and Hargrave explained:
From the earliest times, the most important legislative policy underpinning the Louisiana community property regime has been that spouses share equally "the produce of the reciprocal labor and industry" of both "husband and wife." No matter how married couples organize their livesone earning income, the other managing the home; both working for wages; neither earning wages and both producing things; or whatever the basic rule is that they share equally in whatever each produces and accumulates. Historically, this policy protected the wife who was not a wage earner by giving her a share in the husband's accumulations of income. In more modern times, the policy fosters equality as the household with two working spouses becomes more common.
Spaht and Hargrave, Louisiana Civ. Law Treatise, Matrimonial Regimes, § 3.2 at p. 47 (1997).
In the instant case, if the renewal commissions are the result of Mr. Ross' effort, skill or industry during the existence of the community property regime, the renewal commissions, or at least a portion thereof, are community property. This is in keeping with the basic notion that spouses should share equally "the produce of the reciprocal labor and industry of both husband and wife." Spaht and Hargrave, Matrimonial Regimes, supra § 3.2 at p. 47.
Spaht and Hargrave also discussed the issue of "fruits vs. earnings" in their treatise:
Fruits may be separate property if the appropriate declaration is filed; otherwise, they are community. [footnote omitted]. Property acquired by the effort, skill or industry of a spouse is community, and there is no mechanism provided for making it separate. [footnote omitted]. In the simplest case, production of the fruits would not involve labor or industry of a spousethe typical passive investment. However, it is quite common for many investments to combine one spouse's separate capital or property with community labor to produce fruits.
Spaht and Hargrave, supra § 3.8 at p. 64. The authors then suggest that:
[t]o the extent that labor is producing some benefit, the community ought to share in the profit of that labor. If it is combined with separate capital or other separate property, equity would suggest a proportional division of the profits between the community and separate estates of the spouses. If such a pro rata division is not adopted, it would allow a spouse with separate property to act in bad faith and deprive the community of the revenues by putting all one's efforts into production of fruits from the separate asset.
Id.
Other authors and commentators have suggested the equitable solution of a pro *393 rata division of the property when labor is combined with capital investment to produce fruits.[6] Our courts have also adopted this notion.
On original hearing in Kyson v. Kyson, supra, the second circuit court of appeal found that while money received by the husband, Mr. Kyson, qualified as rental revenue, the rental payments were the result of a substantial amount of time spent by Mr. Kyson on managing the rental property. The court stated:
[E]ven if Mr. Kyson had not participated in the rental management he would have received some rentals as passive investment. We find this to be a case in which "separate capital is combined with community labor to produce fruits. Thus, a determination must be made as to the amount of labor attributed to the investment. An appropriate analysis is to examine the relative contributions of labor and capital to the funds involved and a proration of the funds according to these contributions."
Because the court was unable to determine from the record before it the value of Mr. Kyson's labor in order that the required proration of funds could be made, the court remanded the matter to the trial court for this determination. On rehearing, the court in Kyson, noting that the trial court made no factual finding in this regard, concluded that it was unable to discern from the record sufficient quantification of Mr. Kyson's time and labor associated with the disputed rental income from which it could draw any meaningful conclusion. The court, therefore, reversed its original decision on the basis that the facts did not support its initial conclusion. Although reversed on other grounds, the case remains as authority for prorating income that results both from a spouse's labor and from a return on a separate property investment.
In an earlier case, Paxton v. Bramlette, supra, the court was faced with a dispute over whether corporate distributions to the wife were community salary or separate dividends. The court concluded that the funds were community earnings since it found the wife contributed "substantial services" to two corporations in which she had controlling interests. The wife owned real estate and received rents from those properties that the court characterized as "fruits of her paraphernal property." She later transferred the properties to a newly formed realty corporation. She was paid a salary by the corporation before and after she filed an affidavit reserving the fruits of her separate property. The court, finding that the wife performed most of the managerial duties in operating the corporation, including collecting rents, depositing them, and handling maintenance and repairs, held that the payments after the filing were community and were not fruits of separate property. The wife also owned as separate property 82% of the stock in a corporation that operated furniture stores. She went to the store daily and participated in important decisions, none of which were made without her approval. The court quoted approvingly from law review writers suggesting that the basic analysis in such a case is to examine the relative contributions of labor and capital to the funds involved; if the revenue was the result of substantial capital, it would be a fruit; if it represented substantial labor with little capital, it would be earnings. The court then concluded that her labor was substantial and thus the payments were community earnings.
*394 The court in Gautreau v. Gautreau, supra, also followed this approach and found that to the extent the income derived by the wife from her separate property was paid to her because of her "effort, skill or industry" and was not simply passive income accruing as the result of corporate distributions or the increase in value of the corporation, the income was community property. Gautreau, 96-1548 at 12,13, 697 So.2d at 1349.
Although the issue is res nova in this Court, the difficulty in determining whether revenue is earnings or fruit has been considered in the context of renewal commissions by our colleagues on the courts of appeal. In Michel v. Michel, supra, the husband received commissions on life insurance policies he sold as well as "Factor 1" commissions based on the performance of salesmen he recruited and trained. The husband's work in recruiting and training the sales staff was performed during the existence of the community, however, the sales by the latter and the payments to him came after termination of the community. The first circuit court of appeal held that the wife was entitled to share in her husband's insurance sales commissions on the policy renewals received by her husband after termination, since all of the sums involved related to community effort. The court stated, "while it is true that the spade work had been done when the original sale had been made, some service work had to be performed and in addition there was no certainty that the policies would be renewed." Michel, 484 So.2d at 835. Since the revenue resulted from labor during and after the community, it was to be divided proportionally. Although the court admitted that the amount attributed to post-community work was "speculative," the court of appeal affirmed the trial court's approximation of this interest in giving one-half to the husband's separate estate and one-half to the community.[7]
A different approach was undertaken by the third circuit in Williams v. Williams, 590 So.2d 649 (La.App. 3 Cir.1991). In that case, the court concluded that an ex-husband's renewal commissions attributed to insurance policies sold during the community but paid after termination were not to be shared with his ex-wife. The court suggested that even if the renewal premiums were attributed to work during and after the community, the value to the community was speculative in nature. Thus, it found that the wife's interest was so speculative that it had no value at all.
The court in Futch v. Futch, 26-149 (La.App. 2 Cir. 9/23/94), 643 So.2d 364, expressly disagreed with the holding in Williams and followed the rationale in Michel, supra. The court in Futch stated, "although it may be impossible to perfectly divide renewal commissions generated by insurance policies written during the marriage, we disagree with Williams, supra, and conclude that these renewal commissions are community property subject to partition." Futch, 643 So.2d at 367. The court further found that "[e]quity requires a division in which Mr. Futch's separate labor and costs to keep the policies in effect are considered in determining the community's share." Id. at 369. Finding the record lacked evidence needed to make this determination, the court remanded the matter to the trial court for the taking of such evidence. The court of appeal further found that the burden would be on the husband "to establish his entitlement *395 to more than one-half of the renewal commissions. For many of the policies, no significant servicing may be required; however, for the polices that generate renewal commissions based on Mr. Futch's post-termination efforts or achievement, he, not the former community, is entitled to the fruits of this enhancement." Id.
Spaht and Hargrave have opined that the "[e]quitable considerations as well as basic doctrinal principles support the Michelr-Boyle-Futch approach, even if the division is approximate." Matrimonial Regimes, Louisiana Civil Law Treatise, § 3.4 at 58 (1997).
In the case sub judice, Ms. Starks argues that this case does not involve the "return" on some separate property asset, but rather the income at issue is entirely due to the sales efforts of Mr. Ross. She maintains that the renewal commissions were not "passive income," but were the result of labor expended during the existence of the community.
Ms. Starks argues that under the test enunciated in Paxton, supra, and Gautreau, supra, it is clear that the revenues at issue are community property because Mr. Ross had minimum "capital investment" in his insurance agency, but contributed substantial labor, which produced income during the community regime. She maintains that it was Mr. Ross' sales efforts, his personality, his knowledge of his customers and their insurance needs, and his ability to preserve the right to sell insurance policies by meeting his contractual and legal requirements to do so that created the revenues at issue. Thus, she argues, the only significant investment in the insurance agency was Mr. Ross himself. In other words, the investment was human labor and not economic capital. Ms. Starks further contends that all of the reported decisions by Louisiana courts which have considered renewal commissions acknowledge the rule that some effort is expended by insurance agents to generate renewal commissions.
To the contrary, Mr. Ross argues that the record shows that he did not expend effort, skill or industry during the marriage as it relates to receiving renewals from policies sold some 30 years prior. He contends that he expended no labor during the marriage which was in any way attributable to renewals received during the marital regime. Mr. Ross further maintains that the "balancing test" required in determining the proper characterization of renewal assets was undertaken by the trial court in this matter, which correctly resulted in the court's judgment that Mr. Ross expended little or no effort during the marriage for purposes of receiving these renewals.
We first note, as did the court of appeal, that a trial court's findings regarding the nature of the property as community or separate is a factual determination subject to manifest error review. Biondo v. Biondo, 99-0890, pp. 4-5 (La.App. 1 Cir. 7/31/00), 769 So.2d 94, 99. The trial court in this case did in fact make a factual determination as to the classification of the renewal premiums in this case. The court noted that with the exception of the Williams case, supra, Louisiana jurisprudence has held that renewal commissions received after the termination of the community as a result of the sale of policies (effort, skill or industry) during the existence of the community are community. The trial court then reasoned that it follows that the sale of insurance polices (effort, skill or industry) before the existence of the community were separate property.
In determining whether any effort, skill or industry was expended during the community, the trial court reviewed the trial *396 testimony of Mr. Ross in this regard. The court noted Mr. Ross' testimony that:
"[w]hen he began his business, `Billy Ross Insurance Agency,' he called people all day everyday; occasionally went door-to-door; and attempted to `gain a listening ear' in an effort to generate business. However, by 1992, when he married Mrs. Ross, his business had grown to the level that he was no longer required to `prospect.'" He stated that the nature of effort, labor, skill and industry put into the business since 1992 consists of training employees and evaluating office products. He stated that during the marriage he went to the office three to five days a week for approximately three to eight hours each day. He testified that it has been years since he personally has completed a new application for insurance. However, he has employees who may have done so. Mr. Ross testified that the majority of the money generated by his business is from renewals of policies written prior to the marriage. He further stated that he cannot think of a single thing he did to induce people to renew their policies, nor does he know what he can do to induce people to renew them.
Trial court judgment, p. 3.
The trial court went on to conclude that the effort, skill and industry which ultimately produced the renewals received during the existence of the community were performed prior to the marriage which renders them to be separate property. However, the court did recognize that "despite Mr. Ross' denial that he put forth any effort to generate renewals that were received during the marriage, some servicing may have been required." Thus, the trial court found Ms. Starks would bear the burden at trial to quantify Mr. Ross' efforts, during the minute time frame between the date of marriage and the filing of the declaration, to prove the amount of effort Mr. Ross put forth toward the renewals.
The court of appeal affirmed the trial court's conclusion, finding that "in order to disprove that the renewal commissions received by Mr. Ross were not civil fruits, it was necessary to prove that substantial labor was exerted by Mr. Ross to obtain the renewal commissions during the existence of the community property regime." Ross, 835 So.2d at 821. The court of appeal concluded, based on its own review of the record, that the evidence supports the trial court's determination that Mr. Ross had not expended any significant effort, skill or industry in effecting the renewal of policies pre-existing the community during the existence of the community property regime.
We find that the lower courts erred in assigning the burden of proof and in finding that little or no effort was exerted to generate the renewal commissions. The evidence in the record is to the contrary. Because the renewal commissions were received during the existence of the community, the burden was upon Mr. Ross to prove that they were not community property. Knighten v. Knighten, supra. Despite Mr. Ross' assertions that no effort was required to service customers and maintain his book of business, his deposition testimony reveals that he indeed exerted substantial effort, skill and industry to insure the maintenance of his existing business and to satisfy existing policyholders. According to Mr. Ross, he spent three to five days per week, and an average of five to ten hours per day working at his insurance agency. The parties agree that Mr. Ross certainly did not spend this time generating new business. In fact, new business constituted only 6-7% of the business income. The majority of income *397 from the Billy Ross Insurance Agency came from renewal of policies.[8]
Despite Mr. Ross' assertion that he did nothing, and could do nothing, to produce the renewals, the record reveals that he did in fact provide substantial services to existing policyholders. In his deposition, Mr. Ross testified that he entertained existing policyholders by way of receiving and returning phone calls; answering questions regarding, among other things, accident reports, claims, and general insurance matters. He sent Christmas cards and birthday cards. Further, the business records show that money was allocated to advertising, newsletters, postage and entertaining clients. Mr. Ross maximized his income by servicing and entertaining existing policyholders. We can only conclude that had the customers received no services, "shmoozing," if you will, the agency income would have dropped significantly.
In his testimony, Mr. Ross describes his work as office management and training employees. The fact that Mr. Ross' role at some point changed from direct sales to a supervisory role, does not change this court's decision. The employees were mandataries or agents, acting on behalf of the agency servicing old clients and prospecting for new clients. Any servicing by employees equates to servicing by Mr. Ross himself. Mr. Ross' employees were hired and trained by the Billy Ross Agency and were compensated by the agency, not State Farm.[9]
State Farm even recognizes that its agents perform "service" on existing accounts. In addition to other forms of compensation, the company pays its agents "service compensation." The term is defined in the State Farm Agent's Agreements as follows:
SERVICE COMPENSATION. For services rendered by you in any month while this Agreement is in force, in assisting policyholders, cooperating with adjusters in reporting and handling claims, and cooperating with and promoting the interests of the Company, you shall be paid for such month and amount equal to ...
We find it is inconceivable that Mr. Ross would spend such a significant amount of time "working" at his office, producing substantial income mostly attributable to renewal commissions, and then assert that he did not exert any effort, skill or industry toward producing the renewal commissions. Mr. Ross' assertions in this regard are simply unconvincing.
Based on the above, we must conclude that the renewal commissions received by Mr. Ross during the existence of the community property regime were the result of Mr. Ross' effort, skill and industry exerted during the community regime. Our holding is consistent with the well settled law with regard to what constitutes community property in our state and is in accord with *398 the notion that to the extent that labor is producing some benefit, the community ought to share in the profit of that labor. Accordingly, we find that the lower courts' decisions to the contrary are manifestly erroneous, as they are not supported by the evidence. Ms. Starks is entitled to share in the business income generated by Mr. Ross' work, industry and effort during the marriage.

CONCLUSION
Accordingly, we reverse the lower courts' findings that Mr. Ross did not exert effort, skill or industry during the existence of the community property regime to produce the renewal commissions he received during the regime. We also reverse the lower courts' decision insofar as it places the burden of proof on Ms. Starks to prove her entitlement to a share of renewal commissions during the marriage.
REVERSED.
VICTORY, J., concurs in the result.
KNOLL, J., concurs in the result and assigns reasons.
KNOLL, Justice, concurring.
I concur with the majority's result that the renewal commissions Mr. Ross received during the existence of the community were the result of his effort, skill and industry exerted during the community regime. In my view the majority errs, however, in its analysis that these commissions are civil fruits that are subject to the community regime due to the effort expended by Mr. Ross during the regime, because these commissions are not civil fruits.
I disagree from the majority's holding that the individual insurance policies are juridical acts from which civil fruits may be derived. This is not a matter where Mr. Ross's effort, skill and industry were combined with capital investment. The renewal premiums were not the result of Mr. Ross's separate capital investment or separate property. The renewal premiums, as the majority concludes, were the result of Mr. Ross's effort, skill and industry. "Property acquired by the effort, skill or industry of a spouse is community, and there is no mechanism provided for making it separate." 5 Katherine Spaht & W. Lee Hargrave, Louisiana Civil Law TreatiseMatrimonial Regimes § 3.8, p. 64 (2d ed.1997).
As the majority correctly notes, the treatise suggests that:
If [labor] is combined with separate capital or other separate property, equity would suggest a proportional division of the profits between the community and separate estates of the spouses. If such a pro rata division is not adopted, it would allow a spouse with separate property to act in bad faith and deprive the community of the revenues by putting all one's efforts into production of fruits from the separate asset.
Id. (Emphasis added.)
Mr. Ross's effort and industry were not combined with separate capital or separate property to generate the renewal commissions. In my view, renewal commissions are not civil fruits from an asset; the insurance policies were not Mr. Ross's asset or property.
Certainly the policies are juridical acts and "things;" conceivably they are even assets of the policyholders. The majority's analysis is flawed, however, in finding that because insurance policies are juridical acts and things, civil fruits necessarily flow from them.
"The right of ownership, which according to traditional civilian analysis includes the elements of usus, fructus and abusus, may lawfully be dismembered in a variety *399 of ways either by the intention of the owner or by operation of law." Exposé des Motifs, Title III: Personal Servitudes, La. Civ.Code Ann. (West 1980). Because fruits are a right of ownership, the majority errs in rejecting Ms. Starks's argument that there must be ownership interest in the thing in order to claim ownership of the fruits. Although acquisition of the fruits may be dismembered by a personal servitude, thereby precluding the owner of the thing from claiming ownership of the fruits, it is elemental that if the rights of ownership have not been dismembered, the rights, including the fruits, remain with the owner of the thing. Fruits are a right of ownership; "[i]n the absence of rights of other persons, the owner of a thing acquires the ownership of its natural and civil fruits." La. Civ.Code art. 483.
The majority's analysis that "... under the definition of civil fruits contained in La. C.C. art. 551, Mr. Ross received revenue (renewal commission) by reason of juridical acts (the insurance policies.)" fails to account for the ownership element of the "fruit producing thing" and fails to address the acquisition of the (misnamed) fruits. The insurance policies are contracts between the policyholders and State Farm. The agency contract between Mr. Ross and State Farm was the mechanism that provided for the payment of commissions to Mr. Ross for the renewal of insurance policies sold by him. These commissions are compensation paid to Mr. Ross per the terms of the contract between him and State Farm. Article 551's reference to juridical acts concerns acts that create the civil fruits such as rent, interest and dividends. The code article is not authority that any juridical act that gives rise to payment transforms that payment into a civil fruit. The majority's conclusion that these commissions are civil fruits (a right of ownership) does violence to the civilian concept of ownership.
The majority cites to various appellate court decisions declaring that the courts of appeal have addressed the issue of whether renewal commissions are earnings or fruit. Ross, op. at 394. The majority errs in finding that those courts addressed this issue. In each of those cases, the court was deciding whether the effort, skill and industry were performed during the community regime so that the resulting commissions would be classified as community property. Michel v. Michel, 484 So.2d 829, 835 (La.App. 1 Cir.1986)(Wife was entitled to share in renewal commissions received by husband after termination of the community where policies were sold during the community; because the money was the product of labor during and after the community it was to be divided proportionately[1]); Williams v. Williams, 590 So.2d 649, 653 (La.App. 3 Cir.1991)(Service work performed after termination of the community contributed in great measure to policy renewals making service work performed during the marriage less important vis-a-vis renewals); Futch v. Futch, 26-149 (La.App. 2 Cir. 9/23/94), 643 So.2d 364, 369 (The husband is entitled to deduct from the renewal commissions an amount representative of his post-termination efforts in producing these commissions; he is entitled to the commissions generated by his post-termination efforts and apportionment between the community's and his separate interest should be made accordingly). In none of these cases was the issue ever raised that the commissions were civil fruits. The issue in the matter before us is the same issue that was before the appellate courts in Michel, Williams, and Futch, i.e., whether renewal commissions are classified as community or separate *400 when the initial policies were sold during one regime and the renewal commissions were earned in another. The only difference is that in Michel, Williams and Futch, the polices were sold during the community and the renewal commissions were paid after its termination, whereas, in the matter presently before us, the situation is the complete opposite.
The majority takes an unnecessary circuitous route to reach its result. The issue was simply whether any effort was expended by Mr. Ross during the regime that resulted in commissions earned by him from policies sold before the establishment of the community. Mr. Ross exerted substantial effort, skill and industry to ensure the maintenance of his existing business and to satisfy existing policy holders. Because of his efforts, he continued to receive renewal commissions. These renewal commissions were reported as income on his income tax statements and comprised a significant portion of his total income. Property acquired during the existence of the legal regime through the spouse's effort, skill or industry is community property. See La. Civ.Code art. 2338. All forms of payments in return for one's labor, whatever they may be called, are included. Spaht, § 3.3, p. 48. Commissions representing a percentage of sales or premiums would also be included. Id.
Because, as the majority correctly concludes, Mr. Ross expended significant effort, skill and industry in effecting the renewal of policies pre-existing the community during the existence of the community property regime, these renewal commissions constitute compensation paid in return for work done during the community property regime. Therefore the commissions constitute community property and are subject to Ms. Starks's claim for partition, to the extent or percentage community labor was attributable to the renewals so effected. I find the majority has erred in classifying the renewal commission as civil fruits.
For these reasons, I do not agree with the majority's analysis. I concur only with the majority's result which found the trial court was manifestly erroneous in its determination that the commissions were Mr. Ross's separate property, and the determination that the renewal commissions were the result of Mr. Ross's effort, skill and industry exerted during the community regime.
NOTES
[1] By order of the divorce decree, Ms. Starks resumed the use of her maiden name. Accordingly, we will refer to her as Ms. Starks throughout this opinion.
[2] Yiannopoulos refers to Weiss, Institutionen des romis-chen Privatrechts 135 (2d ed.1949); but cf. Sohm-Mitteis-Wenger, Institutionen 262 (17th ed.1923).
[3] See La. C.C. arts. 488, 551.
[4] La. C.C. art. 545 (1870) provided:

Natural fruits are such as are the spontaneous product of the earth; the product and increase of cattle are likewise natural fruits.
The fruits, which result from industry bestowed on a piece of ground, are those which are obtained by cultivation.
Civil fruits are rents of real property, the interest of money, and annuities.
All other kinds of revenue or income derived from property by the operation of law or private agreement, are civil fruits.
[5] In Section (B) of the 2000 Revision Comments to La. C.C. art 395, a "juridical act" is defined as "a lawful volitional act intended to have legal consequences. It may be a unilateral act, such as an affidavit, or a bilateral act, such as a contract. It may be onerous or gratuitous. See Civil Code Article 3471 (Rev. 1982), Comment (c) (citing 1 A.N. Yiannopoulos, Louisiana Civil Law System Coursebook Section 77 (1977)); 1 Planiol & Ripert, Treatise on the Civil Law, pt. 1, no. 265, at 187 (La.St.L.Inst.trans., 12th ed.1939)."
[6] See Yiannopoulos, Property; Morrow, Matrimonial Property law in Louisiana 34 Tul L.Rev. 3; L'Enfant, Classification of Property, 25 La.L.Rev. 95.
[7] See also Boyle vs. Boyle, 459 So.2d 735 (La.App. 4 Cir.1984), writ denied, 462 So.2d 651 (1985) relied on by the Michel court, wherein, the fourth circuit court of appeal awarded the wife one-half of the renewal commissions on policies written before termination of the community.
[8] As a result of Mr. Ross' effort, the agency had sales of $199,685 in 1992, $218,767 in 1993, $207,147 in 1994 and $261,288 in 1995. 93% to 94% was renewal commissions.
[9] La. C.C. art. 2989 defines mandate as "a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal." An agent is one who acts for or in place of another by authority from the latter. Venable v. U.S. Fire Ins. Co., 02-505 (La.App. 3 Cir. 10/30/02), 829 So.2d 1179 citing Oliver v. Central Bank, 26,932 (La.App. 2 Cir. 5/10/95); 658 So.2d 1316, 1321 writ denied 95-1469 (La.9/22/95); 660 So.2d 477. The terms "mandatary" and "agent" are sometimes used synonymously. Cases have held that a mandatary or agent is one who acts in place of another by authority from him. Baker v. Purselley, 411 So.2d 553 (La. App. 1 Cir.1982).
[1] See Spaht, § 3.4, p. 57.