| JAMES MIDDLETON HUGER | * | NO. 2021-CA-0535 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| STEPHANIE GOLIWAS | * | |
| HUGER | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2018-07554, DIVISION "K"
Honorable Bernadette D'Souza, Judge
\* \* \* \* \* \*
**Judge Joy Cossich Lobrano**
\* \* \* \* \* \*

(Court composed of Judge Joy Cossich Lobrano, Judge Paula A. Brown, Judge
Dale N. Atkins)


Mark J. Mansfield
Amy C. Cowley
TRANCHINA & MANSFIELD, LLC
321 E. Kirkland Street
Covington, LA 70433

    COUNSEL FOR PLAINTIFF/APPELLEE


Marc D. Winsberg
Jonathan D. Gamble
WINSBERG HEIDINGSFELDER & GAMBLE, LLC
650 Poydras Street, Suite 2050
New Orleans, LA 70130

    COUNSEL FOR DEFENDANT/APPELLANT


                    **REVERSED**

                    **DECEMBER 14, 2022**

This is a domestic case. Defendant/appellant, Stephanie Goliwas Huger ("Wife"), appeals the May 24, 2021 judgment of the district court, which overruled Wife's objection to the Special Master's recommendation regarding classification of assets. For the reasons that follow, we reverse.

## FACTS AND PROCEDURAL HISTORY

The instant appeal requires this Court's review of a narrow issue: whether certain property is properly classified as community or separate. Plaintiff/appellee, James Middleton Huger ("Husband"), and Wife were married on April 16, 1994. Four children were born of the marriage, who have all reached the age of majority. The parties have a community property regime, and no premarital agreement was established before the marriage. Husband was gifted and/or inherited certain assets before and during the marriage. After college graduation, Husband worked in the parking lot management business. Both before and during the marriage, he was employed by a family company, Dixie Parking Service, Inc. ("Dixie"). At the time of the marriage, Husband owned 44.39% of the stock in Dixie as his separate

property. On December 21, 1995, the parties executed a declaration of paraphernality regarding separate property that Husband brought into the marriage in which Husband reserved all natural and civil fruits as his separate property. The declaration of paraphernality was filed into the conveyance records in Orleans Parish on or about January 3, 1996.

On July 30, 2018, Husband filed a Petition for Divorce pursuant to Louisiana Civil Code Article 102, and on September 6, 2019, a judgment of divorce was granted. On February 12, 2019, the parties entered into a consent judgment to appoint Steven J. Lane as Special Master to make findings and recommendations regarding the determination, valuation, and allocation of the parties' community assets, liabilities, and reimbursement claims.[1] A bifurcated traversal trial took place on August 19, 20, and 21, 2020, and September 21, 2020, during which the Special Master received evidence and heard oral argument and testimony regarding the classification of certain assets. The assets in dispute were largely comprised of the parties' interests in numerous limited liability companies ("LLCs").

---

[1] Louisiana Revised Statute 13:4165 governs the appointment, duties, and powers of special masters in particular civil cases. "Pursuant to the inherent judicial power of the court and upon its own motion and with the consent of all parties litigant, the court may enter an order appointing a special master in any civil action wherein complicated legal or factual issues are presented or wherein exceptional circumstances of the case warrant such appointment. . . ." La. R.S. 13:4165(A). "The court may order the master to prepare a report upon the matters submitted to him and, if in the course of his duties he is required to make findings of facts or conclusions of law, the order may further require that the master include in his report information with respect to such findings or conclusions." La. R.S. 13:4165(C)(1). "Within ten days after being served with notice of the filing of the report, any party may file a written objection thereto. After a contradictory hearing, the court may adopt the report, modify it, reject it in whole or in part, receive further evidence, or recommit it with instructions. If no timely objection is filed, the court shall adopt the report as submitted, unless clearly erroneous." La. R.S. 13:4165(C)(3).

On November 4, 2020, the Special Master issued a report of his recommendation concerning classification of the assets in dispute. The Special Master recommended that sixteen properties are assets of the community and that Husband's interest in fourteen assets are Husband's separate property. The recommendation reflects the parties' stipulation that fifteen additional assets were Husband's separate property. On November 13, 2020, Wife filed an objection to the Special Master's recommendation. Following a contradictory hearing on May 10, 2021, the district court rendered judgment on May 24, 2021, adopting the Special Master's recommendation in its entirety. The district court then rendered a judgment on June 28, 2021, designating the May 24, 2021 judgment as final for the purposes of immediate appeal. This appeal followed, in which Wife contests the classification of twelve of these assets as Husband's separate property.

## ASSIGNMENTS OF ERROR

Wife raises the following assignments of error on appeal:

1. The trial court erred in concluding that Appellee presented sufficient evidence to overcome the strong legal presumption that his interest in twelve entities formed or acquired during the marriage are community property.

2. The trial court erred in applying the principle of real subrogation to the pertinent transactions at issue and finding that the nature of certain capital contributions resulted in the business entities being classified as separate property.

3. The trial court erred in considering and relying on the parties' intent when determining the classification of any assets in dispute.

## DISCUSSION

**Classification of Community and Separate Property**

Under Louisiana law, property of married persons is classified as either community or separate. La. C.C. art. 2335. The classification of property as separate or community is fixed at the time the thing is acquired. *In re Succession of Allen*, 05-0745, p. 3 (La. App. 4 Cir. 1/4/06), 921 So.2d 1030, 1032. Pursuant to Article 2338 of the Louisiana Civil Code, community property is comprised of:

> property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property.

Under Civil Code Article 2341, separate property of a spouse includes, in relevant part:

> property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate things used. . . .

A district court's findings as to whether property is community or separate are factual determinations subject to manifest error review. *Ross v. Ross*, 02-2984, p. 18 (La. 10/21/03), 857 So.2d 384, 395. Things possessed by either spouse during a community regime are presumed to be community things, but either spouse may rebut the presumption. La. C.C. art. 2340. The spouse seeking to rebut the

4

presumption of community bears the burden to prove by a preponderance of the evidence that the things are separate property. *Talbot v. Talbot*, 03-0814, p. 12 (La. 12/12/03), 864 So.2d 590, 600.

"The principle of real subrogation is applicable to both separate and community property." La. C.C. art. 2341, cmt. (c). Under real subrogation, when a separate asset of a spouse is utilized to obtain a new asset, that new asset remains the spouse's separate property. Thus, "when a thing forming a part of the separate property of a spouse is converted into another thing, the mass of the separate property is not diminished"; "[t]he new thing takes the place of the old. . . ." *Id.* Real subrogation "allow[s] a spouse with separate assets to manage and replace those assets as a patrimonial mass independent of the community." *Curtis v. Curtis*, 07-392, p. 9 (La. App. 3 Cir. 11/7/07), 969 So.2d 1277, 1283 (quoting Katherine S. Spaht & W. Lee Hargrave, *Louisiana Civil Law Treatise: Matrimonial Regimes*, § 3.47 (2d ed. 1997)). "Partnership interests owned by a person before marriage remain separate property." *Id.* "If that equity position is replaced with a similar equity interest in a succeeding partnership or corporation, real subrogation occurs and the new interest remains a separate asset." *Id.*

**JMH Realty, LLC**

We now discuss the specific assets in dispute. JMH Realty, LLC ("JMH") is a real estate holding company. The parties and the Special Master characterize JMH as the crux of this appeal, because most of the entities at issue were funded with contributions from JMH. The Special Master recommended that JMH is 98%

Husband's separate property and 2% Wife's separate property; that the parties are both members of the LLC; and that no valid operating agreement exists. Thus, according to the Special Master, the parties are each entitled to half the profits of the LLC pursuant to La. R.S. 12:1323.[2]

In reaching this recommendation, the Special Master agreed with Husband's argument that the principle of real subrogation applies. JMH was formed during the marriage with an initial capital contribution of $1,000, which, according to Husband's testimony, was an advance of capital from Husband's separate property interest in Dixie.[3] Husband described the initial capital contribution as a "due to/due from," which he understood to be an accounting mechanism to track advances from one entity to another. The Special Master determined that Husband was the only living witness able to testify to the events surrounding the formation of JMH, particularly, the source of the funds used to capitalize JMH, and the Special Master was persuaded by Husband's testimony as to the source of said funds.

---

[2] La. R.S. 12:1323 provides as follows:

> The profits and losses of a limited liability company shall be allocated among the members and among classes of members in the manner provided in a written operating agreement. To the extent the operating agreement does not so provide in writing, profits and losses shall be allocated equally among the members. The provisions of this Section regarding the allocation of losses shall not affect the limitations on the liability of members and managers set forth in R.S. 12:1320.

[3] As defined by La. R.S. 12:1301(A)(3), " 'Capital contribution' means anything of value that a person contributes to the limited liability company as a prerequisite for, or in connection with, membership, including cash, property, services rendered, or a promissory note or other binding obligation to contribute cash or property or to perform services."

The parties stipulated to the following. JMH was formed on July 11, 1994, which was during the marriage but before the parties executed the declaration of paraphernality reserving fruits of Husband's separate property to Husband. The Articles of Organization show $1,000 total contributions of capital to JMH: $980 from Husband and $20 from Wife. The Articles of Organization do not identify the source of the parties' capital contributions or whether the funds contributed were the separate or community property of the respective spouses. The $1,000 initial funding was recorded on JMH's balance sheet and ledger as equity contributions to accounts named "CONTBNS/JMH" (98% ownership interest) and "CONTBNS/SJG" (2% ownership interest) for amounts of $980 and $20, respectively. The first piece of property acquired by JMH was 400 S. Rampart Street on July 20, 1994.

Husband was the only witness who testified to his recollection of the source of funds used to capitalize JMH. According to Husband, the $1,000 contribution to JMH was an advance of capital from Husband's separate property interest in Dixie. In capitalizing JMH this way, Husband had intended to keep JMH as his separate property to carry forward to his children. Husband testified that he gifted Wife a 2% interest in JMH, and both parties testified that they joked about their respective 98% and 2% ownership percentage interests during the marriage.

Husband's CPA expert, Marc DeRouen, testified to five forms of payments, which can be made to LLC owners: salaries, distributions, loans, advances, and liquidating (or partially liquidating) distributions. According to DeRouen's

testimony, advances coded as "due to/due from" are prevalent in closely held companies. DeRouen explained the difference between a loan and an advance, in that loans are more formal, while with an advance there is no certainty of repayment, no profit, no interest, and no collateral. DeRouen stated that, where an owner receives an advance that is not repaid, the owner will receive less at the liquidation of the LLC, because the owner has already been advanced a portion of his capital. Other witnesses, including Husband's forensic expert Chris Peters and the Chief Accounting Officer of JMH Companies Management Brian Showalter, gave similar testimony that a "due to/due from" is not coded as a loan and interest is not charged; rather, "due to/due from" is used to track the flow of money between companies, particularly those with similar ownership.

Husband introduced into evidence a memorandum created contemporaneously with the formation of JMH. The memorandum at issue is dated August 23, 1994, and is addressed to Husband from Andrew Hoffman, who at the time was the controller for Husband's family company, Gulfside, Inc., stating, in relevant part:

> I have shown the $1,000 down payment on the property as a contribution by you and Stephanie into JMH Realty, LLC. In your books I have also shown the debt as due to Dixie and set up the LLC as an investment. I noticed a separate advance from Dixie on 6/22/94 of $1,205.00, ($205 for personal expenses and $1,000 unknown) that I assumed is not related. If I am correct Rob should show the $1,000 down payment as a loan to you by Dixie.

Hoffman testified that he had no memory of this transaction, did not keep Dixie's books, and did not know how Dixie coded the transaction on its books.

Based on his review of his memorandum, Hoffman understood his language as a question to Husband, not a statement, as to whether the $1,000 should be recorded as a loan or something else on Husband's books. Hoffman's mention of "Rob," referred to Rob Crews, then the accounting manager and controller for Dixie, who is deceased and did not testify. No one who was employed by JMH or Dixie in 1994 testified at trial.

Wife contends that Husband failed to rebut the presumption that JMH is community property and that the principle of real subrogation does not apply to JMH's formation. Wife argues, in part, that Husband's testimony regarding capitalization of JMH was uncorroborated and contradicted by other evidence. We agree.

We find, as a matter of law, that a spouse's uncorroborated testimony, contradicted by other evidence, is insufficient to rebut the presumption of community by a preponderance of the evidence. No Dixie ledgers, bank records, or cancelled checks were introduced to provide evidence of the source of funds for any initial capital contribution into JMH. No claim was made and no evidence was introduced that Husband sold any Dixie stock to fund the initial capitalization of JMH with such proceeds. Hoffman's memorandum is the only contemporaneous document referencing Dixie as the source of funds contributed to JMH. The memorandum, however, does not corroborate Husband's testimony that $1,000.00 of his equity position in Dixie was advanced to JMH at the time of its formation. Instead, the memorandum describes a "$1,000 down payment on the property" as a

"debt [] due to Dixie" which Hoffman anticipated Dixie should document in its books as a "loan" to Husband.[4] Nothing in this description substantiates that Husband's separate property stock in Dixie was converted and subrogated to his newly formed interest in JMH.[5] Hoffman was likewise unable to testify to any independent recollection of this transaction.

We have located no reported cases addressing Louisiana courts' treatment of an advance of capital in classifying separate or community property. We recognize the policy consideration furthered in *Talbot*, 03-0814, p. 12, 864 So.2d at 599-600, in accepting parol testimony to sustain a spouse's burden of proving the separate nature of property by a preponderance of the evidence. The Supreme Court deemed:

> [N]ear impossible the ability of some spouses to prove the separate nature of property acquired, as in this case, years before the establishment of the regime and decades before its termination. During that broad expanse of time, records are lost, destroyed, and possibly even stolen, and to satisfy this burden of proof, a spouse will potentially need to keep evidence of every donation and gift received and purchase and transfer made dating back years before marriage, even as in this case into childhood. This is an

---

[4] Wife contends that a loan from Dixie to Husband would create a community debt used to fund JMH, such that the proceeds of the loan, used to capitalize JMH, are a community asset. *See* La. C.C. art. 2360 ("An obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse is a community obligation.").

[5] *Contrast Curtis*, 07-392, p. 9, 969 So.2d at 1283 (husband's pre-marriage, separate property equity interest in his former law corporation was cashed out and transferred to a similar equity position in the new law corporation); *Smith v. Smith*, 95-0913, pp. 9-10 (La. App. 1 Cir. 12/20/96), 685 So.2d 649, 654-55 (husband's ownership of the stock in a new medical corporation formed during the marriage was his separate property as it was essentially identical to a former corporation whose charter was revoked, and the new medical corporation was formed with the proceeds of the sale of husband's shares in the former corporation); *Moise v. Moise*, 06-876, p. 6 (La. App. 5 Cir. 3/13/07), 956 So.2d 9, 12 (land, which was husband's undisputed separate immovable property, was his capital contribution in consideration for 100% ownership in LLC).

> impractical and unwieldy burden, which the Legislature and the Law Institute did not intend through their revision of the community presumption. . . ."

*Id.*

Nevertheless, Mrs. Talbot introduced documentary proof that she was the registered holder of the stocks at issue, and her unrefuted testimony that she received the stocks from her grandfather many years before the marriage was corroborated by testimony of two fact witnesses, her brother and sister, who likewise received stocks from their grandfather under similar circumstances. *Id.*, 03-0814, pp. 13-14, 864 So.2d at 600-01. No such evidence exists in this case, and we find *Talbot* distinguishable. While we find no error in the district court's allowance of Husband's testimony as parol evidence of the source of funds, under the circumstances presented, the district court erred in its assessment that Husband's testimony, alone and without more, met his burden to rebut the presumption of community by a preponderance of the evidence.

Husband presented evidence of his business practice of using "due to/due from" in the course of accounting for advancing funds from one business interest to another. Testimony of Husband's accountants and experts supported Husband's contention that an advance of capital is an existing accounting mechanism used in closely held and related business entities. Even so, none of the evidence introduced before the Special Master corroborated Husband's testimony that his capital account in Dixie was the source of the funds forming the $1,000 capital contribution to JMH. Rather, Hoffman's memorandum, generated close in time to JMH's formation, suggested a loan from Dixie and contradicted Husband's

11

testimony that his separate property – equity in Dixie – provided the initial funding to JMH.

While this Court can appreciate the policy considerations behind permitting parol evidence under the circumstances presented, such policy cannot be read so broadly as to allow a spouse to establish his separate property with only his testimony, where other evidence contradicts that classification. Something more is required. It must not be overlooked that Husband, as the spouse seeking to establish the separate nature of property, bore the burden of rebutting the presumption of community. We find that he failed to establish the separate nature of JMH by a preponderance of the evidence, and did not overcome the presumption that JMH is community property.

**Remaining Assets**

Turning to the eleven remaining entities at issue, all were formed during the marriage and after the formation of JMH. These entities received initial funding from JMH, which this Court has determined is a community asset.

Breakwater Investments, LLC is a subsidiary of JMH and received its initial capital from a transfer of real estate from JMH. Orcutt, LLC received initial funding from a distribution from JMH to Husband. Muskeget, LLC, Belladonna Day Spa, Inc., and Mahoney's 2 Iberville St., LLC received initial funding as an advance from JMH. Pinnacle Property Management, LLC was capitalized by contributions from Husband and Wife, and Husband testified the source of the contributions was JMH.

Husband purchased a 95% interest in Winnie's Artsy Café, LLC using funds advanced from JMH and from Husband's checking account. Magazine Street Foods, LLC's initial activity was the purchase of real estate with funds advanced from JMH. JMH owns an interest in Ekistics Hospitality Group, LLC. JMH also owns 100% of JMH Realty No. II, LLC. RT, II, LLC's initial activity was the acquisition of a yacht from JMH Realty No. II, LLC.

It is undisputed that JMH provided initial funding for each of these assets. Property acquired with community things is classified as community property. *See* La. C.C. art. 2338. Considering our conclusion that JMH is a community asset, and for the reasons discussed herein, we find that the district court erred in finding that Husband rebutted the presumption that his interests in these eleven entities are community property. These assets must likewise be classified as community property.[6]

Finding that Husband failed to establish the separate nature of his interest in JMH and the subsequently formed entities, we reverse.

## CONCLUSION

Accordingly, for the reasons ascribed in this opinion, we reverse the judgment of the district court.

**REVERSED**

---

[6] Considering our conclusion, we find it unnecessary to reach Wife's remaining arguments.