|,GUIDRY, J.
This appeal is taken from a judgment partitioning community property. For the reasons that follow, we affirm in part, amend in part, and remand.
FACTUAL AND PROCEDURAL BACKGROUND
Michael Delahaye and Mary Jo May-field [1] were married on February 27, 1971. At that time, Mr. Delahaye was an agent for New York Life Insurance Company (New York Life), having entered into an agent’s contract with that company on September 16, 1968. He remained an agent of New York Life through the time of the proceedings below.
On April 26, 1999, Ms. Mayfield filed a petition for divorce. Mr. Delahaye filed a separate petition for divorce on August 26, 1999. A judgment of divorce was rendered on October 12, 1999, based on the parties having lived separate and apart for six months. The community of acquets and gains between the parties was terminated retroactively to April 26, 1999. *825 Thereafter, Ms. Mayfield filed a petition for judicial partition of the community property. Following extensive discovery and negotiations, the parties were able to agree on the distribution of some, but not all, disputed items of property. In particular, the parties disagreed as to whether the former matrimonial home and certain payments (referred to as “Senior Nylic”) received by Mr. Delahaye from New York Life after termination of the community were community or separate in nature.
Following a request for injunctive relief by Ms. Mayfield, a consent judgment was rendered in April 2001 ordering Mr. Dela-haye to deposit one-half of the monthly Senior Nylic payments into a joint, interest-bearing escrow account, pending classification of the payments.
Pursuant to agreement of counsel, the parties submitted the issues of the classification of the former matrimonial home and the Senior Nylic payments to |sthe trial court on memoranda. On March 7, 2003, the trial court issued a ruling characterizing the Senior Nylic payments as “renewal commissions” that were community in nature even though received after termination of the community, since they were paid based on policies written during the existence of the community. The court further ruled that Mr. Delahaye bore the burden of proving any claim that he was entitled to more than 50% of these payments because his separate labor and expenses were necessary to keep the policies in effect. Finally, the court ruled the former matrimonial domicile was the separate property of Ms. Mayfield, although subject to Mr. Delahaye’s reimbursement claim for one-half of any community funds used to enhance the property. Both parties filed motions for new trial. In her motion for partial new trial, Ms. Mayfield asserted that, while the court correctly classified the Senior Nylic payments as community property, the court erred in considering these payments to be “renewal commissions.”
Trial was held on March 24 and 27, 2003. At the conclusion, the trial court ruled that Ms. Mayfield was entitled to one-half of all future Senior Nylic payments attributable to policies written during the existence of the community,[2] as well as one-half of all cost-of-living and incremental increases attributable to those policies. Additionally, the court held Ms. Mayfield was entitled to one-half of the Senior Nylic payments received by Mr. Delahaye during the period from May 15, 1999 to March 15, 2001, together with legal interest from the respective dates that each payment was received by Mr. Delahaye. Ms. Mayfield was awarded all of the escrowed Senior Nylic funds, as well as one-half of certain renewal commissions stipulated by the parties to be community (after deduction of expenses Mr. Delahaye proved he incurred to secure the renewals).
In oral reasons, the court held Mr. Dela-haye was not entitled to more than one-half of the Senior Nylic payments because it was not satisfied that any |4servicing of the policies written during the community was necessary to the continuation of the payments. The court believed that, to the extent that there was any servicing of these policies, it was for the purpose of generating new business, and had no effect on the Senior Nylic payments. Finally, pursuant to a joint stipulation, the court ruled Mr. Delahaye was entitled to reimbursement for one-half of the community *826 funds used to build the former family-home.
A written judgment was signed on August 4, 2003. In addition to allocating the various assets and debts of the community, the judgment ordered Mr. Delahaye to pay a total of $269,386.29 to Ms. Mayfield, which amount consisted of an equalizing payment, reimbursement claims, and an accounting between the parties. To facilitate partition of the community, several Qualified Domestic Relations Orders (QDROs) were attached to the judgment, including one dealing with retirement benefits. That QDRO recognized Ms. May-field’s 50% interest as of April 26, 1999, in the “New York Life Retirement Plan for Agents” and the “NYLIC Excess Plan” (hereafter “the retirement plan”), as well as her right to a pro rata share in any cost-of-living increases or other increases attributable to her community interest. Mr. Delahaye has appealed.
ASSIGNMENTS OF ERROR
1. The trial court erred in classifying the Senior Nylic payments as renewal commissions and awarding one-half of these post-divorce payments to Ms. Mayfield, since these payments are actually a salary or commission requiring his continued employment
2. Alternatively, even if the Senior Nylic were properly classified as community property, equity required that his separate labor and costs in keeping the insurance policies in effect be considered in determining the community’s share. The trial court committed manifest error in not proportionally reducing Ms. Mayfield’s share by these costs.
3. The trial court committed manifest error in awarding Ms. Mayfield legal interest from the date Mr. Delahaye received each Senior Nylic payment.
4.The trial court erred in awarding Ms. Mayfield one-half of any future increases in the retirement attributable to post-divorce increases in Senior Nylic payments.
| fi5. The trial court erred in excluding from evidence a summaries prepared by his Mr. Delahaye’s CPA, when the summaries were based on documents already provided to Ms. Mayfield’s attorneys.
Assignments Of Error Numbers One and Two
In these assignments of error, Mr. De-lahaye contends the trial court erred in classifying the Senior Nylic payments as renewal commissions and community property. He argues the payments are his separate property because they constitute current incentive income, rather than renewal commissions. He maintains he must earn these payments by remaining an active agent, servicing existing policies, maintaining records, and meeting certain other contractual requirements. He further complains the partition was inequitable because it granted greater rights to Ms. Mayfield than to him since it allowed her to simultaneously collect Senior Nylic payments and retirement benefits, while he is unable to do so. Alternatively, he contends that, if the payments are community property, Ms. Mayfield’s share should have been reduced in proportion to the post-termination efforts and expenses he incurred to maintain the policies in force.
In response, Ms. Mayfield contends the Senior Nylic payments are not salary for current services, but are based instead on the amount and persistency of policies sold during the marriage. She maintains Mr. Delahaye earned the right to these payments by his past efforts, and he does not have to sell additional insurance, service the existing policies, or do anything else to receive them, other than remaining a New York Life agent.
*827 During the existence of the community, each spouse owns an undivided one-half interest therein. La. C.C. art. 2336. Louisiana Civil Code art. 2338 defines community property as:
... property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the | ^community; and all other property not classified by law as separate property.
To the extent that a right to receive proceeds derives from a spouse’s labor and industry during the existence of the community, that right is a community asset, even if the proceeds are received after dissolution of the community. See La. C.C. arts. 2338 and 2369.2; Sims v. Sims, 358 So.2d 919, 921 (La.1978); Futch v. Futch, 26-149, p. 3 (La.App. 2nd Cir.9/23/94), 643 So.2d 364, 367. See also Michel v. Michel, 484 So.2d 829 (La.App. 1st Cir.1986).
A trial court’s finding regarding the nature of property as community or separate is a factual determination subject to the manifest error standard of review. Biondo v. Biondo, 99-0890, pp. 3-5 (La. App. 1st Cir.7/31/00), 769 So.2d 94, 99. Thus, where there is a reasonable factual basis in the record for the trial court’s finding, an appellate court may set it aside only if, after reviewing the record in its entirety, it determines the trial court’s finding was clearly wrong. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous. Biondo, 99-0890 at p. 5, 769 So.2d at 99.
In the instant case, the record reveals that Nylic is a contractual incentive plan whereby New York Life pays monthly supplemental payments in addition to regular commissions to its eligible agents. The payment amount is calculated in accordance with a formula based on the duration of the agent’s membership in Nylic and the amount of qualifying insurance sold by the agent in specified prior years that has remained in force. To be eligible for Nylic membership an agent must:
1) remain an agent with the company;
2) procure $250,000 in new insurance each year upon which premiums have been paid and received by the company (an agent is exempted from this requirement after completion of thirty years in Nylic);
3) comply with all the terms, provisions, conditions, and rules of the Nylic contract;
|74) not engage in any other business or occupation for remuneration or profit without the company’s written consent; and
5) not represent any other insurance company.
An agent’s membership in Nylic is terminated if he fails to meet the above requirements, is not longer an agent for New York Life, retires, begins receiving physical disability income, or dies.
After 20 consecutive years of membership in Nylic, an agent is entitled in his 21st year to become a member of the Senior Nylic plan, which includes enhanced benefits that take into consideration the amount and persistency of qualifying insurance written by the agent in the prior 20-year period. Additionally, beginning in the agent’s 26th year, and every five years thereafter, the agent is entitled to an increase in the amount of Senior Nylic payments received based on the amount and *828 persistency of qualifying insurance sold during the preceding 10 years. After an agent has completed 30 years of membership, he is exempt from the requirement of selling $250,000 of qualifying insurance each year.
The deposition of Justin Huber, an agent benefits consultant with New York Life, was introduced at trial. Mr. Huber explained the following details of the Nylic plan. After an agent passes each of the milestone dates noted (i.e., 21st year, 26th year, 30th year, etc.) and his monthly payment amount is calculated, he is entitled to the payments as long as he meets the requirements noted above. The amount cannot be reduced unless one of the policies upon which the calculation is based is rescinded.[3] Moreover, an agent is not required to service the policies upon which his Senior Nylic payments are based to receive the payments. Since the Senior Nylic payments are based on past productivity and persistency, they are not |Raffected if the policies upon which the payments are based lapse[4] or are not renewed after the milestone date has passed.[5] Regarding the instant case, Mr. Huber indicated that basically all Mr. De-lahaye has to do to receive Senior Nylic payments is to remain an agent in good standing and operate under the Nylic contract. Mr. Delahaye is not required to sell additional insurance or service the existing policies.
Mr. Delahaye became a Senior Nylic member in October 1988. He received an incremental increase in October 1993, and another in October 1998, upon completion of his 30th year. At the time the community regime terminated, he was receiving over $16,200 per month in Senior Nylic payments. He contends these payments are his separate property because they are compensation for his current efforts in servicing existing policies, maintaining required records, and handling correspondence to and from policyholders and New York Life.
The trial court concluded the Senior Nylic payments were community in nature. The court further found that servicing of the policies sold during the community was not a requirement for receiving the payments. The court believed servicing of the policies had no effect on the current Senior Nylic payments, and was done primarily for the purpose of generating new business. To the extent that any servicing of the policies was required, the court believed it was covered by the persistency bonus paid annually by New York Life for the purpose of defraying expenses. Accordingly, the court divided the payments equally between the parties.
*829 IsAfter careful consideration of the Nylic plan and the arguments of counsel, we find no manifest error in the trial court’s conclusions that the Senior Nylic payments, insofar as attributable to policies sold and maintained in force during the existence of the community (“community policies”), were a community asset under La. C.C. art. 2338, even though the payments were received after termination of the community.[6] These payments are not compensation for current services performed by Mr. Delahaye. The calculation formula for Senior Nylic payments is based on the amount and persistency of insurance sold in previous years only, without any consideration of current or future services. Mr. Delahaye was receiving over $16,200 per month at the time of trial based on 30 years of prior membership in Nylic, 27/£ of which were during the existence of the community. The entire amount of the payments was attributable to policies sold and maintained in force during the marriage, with the exception of $48.65 per month.[7] Thus, except for the minuscule portion attributable to policies sold before the parties’ marriage, Mr. De-lahaye acquired the right to receive the Senior Nylic payments based on labor, skill, and industry exerted during the existence of the community. Having earned the right to these payments during the community regime, Mr. Delahaye is entitled to them as long as he remains a New York Life agent and meets the general requirements of the Nylic contract. There is no requirement that he sell additional insurance. Further, even if the policies upon which the payments are based lapse, it would not affect Mr. Delahaye’s right to |1(1receive the payments at their current level. These payments can be reduced only if a policy is rescinded, which has never happened to Mr. Delahaye.
Although Mr. Delahaye claimed servicing of the existing policies was a requirement for the payments, and stated that he and his staff spend a considerable amount of time servicing existing policies, the trial court rejected this contention. The court concluded servicing of the policies was not a requirement for receiving Senior Nylic payments. We find no manifest error in this conclusion, which is amply supported by the record. The terms of the Nylic contract itself impose no such requirement. Moreover, the deposition testimony of Mr. Huber clearly indicated servicing of the policies was not a requirement for receiving payments. Finally, the court’s conclusion is strongly supported by the fact that the lapse or non-renewal of the policies upon which the payments are based will not cause a reduction in the payments. The record clearly establishes that the Senior Nylic payments are compensation for Mr. Delahaye’s past performance and services to the company, almost all of which occurred during the existence of the community. Accordingly, we find no manifest error in the trial court’s classification of the Senior Nylic payments as an asset *830 of the community to be divided equally between the parties (with the exception of the small portion attributable to policies sold prior to the existence of the community).
Mr. Delahaye contends the Supreme Court’s recent decision in Ross v. Ross, 02-2984 (La.10/21/03), 857 So.2d 384, supports his position that the post-divorce Senior Nylic payments are his separate property because of the efforts he must continually exert to keep these policies in force. In Ross, the Supreme Court held that renewal commissions received during an insurance agent’s marriage were the result of the agent’s effort, skill, and industry during the existence of the marriage, and were therefore community in nature, even though he originally sold the policies before the marriage. The Supreme Court reasoned the renewal commissions would have dropped significantly had the agent not exerted substantial effort to service the In existing policies and satisfy the needs of his existing policyholders so as to encourage renewals.
The instant case is distinguishable from Ross because the compensation provided by the Nylic contract differs substantially from the renewal commissions at issue in Ross. In that case, the agent received no payment if the existing policies were not renewed. Thus, it was crucial that he exert continuous effort, skill, and industry to ensure renewal of the policies. In contrast, Mr. Delahaye’s current Senior Nylic payments are not affected if the policies upon which they are based are not renewed, since the payments are based on past sales and persistency. As Mr. Huber explained, the only thing that could cause a reduction in these payments is rescission of a policy, which had never occurred. Servicing of these policies by Mr. Dela-haye is not a requirement for continuation of the payments. Thus, while servicing the policies and “schmoozing” the policyholders might be important to Mr. Dela-haye for the purpose of earning renewal commissions and generating new business, it is not a requirement for Senior Nylic payments, nor will the non-performance of these services cause a reduction in the payments.
The situation is somewhat different with respect to future increases in Senior Nylic payments, in which Ms. Mayfield was awarded a proportionate share to the extent they are attributable to community policies. Mr. Delahaye was scheduled to receive his next increase shortly after trial in October 2003. The amount of the increase depended upon the amount of insurance sold and maintained in force during the prior ten years, part of which was post-termination. To the extent that it was shown that any portion of the increases were attributable to Mr. Delahaye’s post-termination efforts and costs in servicing the community policies, he would be entitled to deduct that amount from the payments. However, Mr. Delahaye bore the burden on establishing at trial that he is entitled to more than one-half of the increases attributable to the community policies due to his post-termination efforts h?,and expenses. Cf. Futch, 26-149 at p. 6, 643 So.2d at 368; Lee Hargrave, Matrimonial Regimes, 53 La.L.Rev. 877, 889 (1993).
At trial, Mr. Delahaye testified he spent considerable time servicing existing policies. His present wife, Cristy Delahaye, who works with him at the agency, gave similar testimony. Further, an employee, Susan West, stated that she spent approximately 80% of her time in service-related activities. However, no one gave any indication of how much of this service work was related to the particular community policies considered in calculating the incremental increases. Mr. Delahaye admitted *831 it was possible to determine what servicing had previously been done on particular files, but no such information was provided regarding the community policies. Further, both Mr. Delahaye and Cristy Dela-haye testified that his primary efforts were directed toward generating new business. For this work, Mr. Delahaye receives substantial first year commissions, as well as renewal commissions for several years if the policies are renewed. In the complete absence of any evidence quantifying the amount of servicing and expenses necessary to maintain the community policies during the applicable period, Mr. Delahaye failed to meet his burden of proving he was entitled to more than one-half of the increases attributable to these policies.
Further, the mere fact that Mr. Dela-haye is required to remain a New York Life agent in order to receive the Senior Nylic payments does not defeat their community nature. See Michel, 484 So.2d at 835. Nor are the requirements that an agent not represent any other insurance company or engage in another business without permission sufficient to defeat the community nature of the payments in this ease. At the time of trial, Mr. Delahaye had permission from New York Life to conduct a separate brokerage business selling insurance through other companies. In fact, he had formed a company for this purpose, which operated as a limited liability corporation. While he testified he did not conduct much such business, the crucial fact is that he was not prohibited from doing so.
11sThe present situation is similar to that in Michel, where after the dissolution of the community the husband received “Factor 1” commissions from his employer. These commissions were based on the efforts of sales agents that the husband previously recruited and trained for the company. Even though the commissions were received after the termination of the community, they were held to be a community asset since the husband completed the recruitment and training of the agents and the contracts of the agents were executed during the existence of the community. The fact that the husband had to continue working for the company in order to receive the “Factor 1” commissions was held not to defeat their community nature. Michel, 484 So.2d at 834-35.
 We are equally unpersuaded by Mr. Delahaye’s contention that the payments were not subject to partition and are his separate property, because he did not have a “vested” right in them at the time the community terminated. It is not essential that a right be vested before it can be classified as a community asset subject to partition. Futch, 26-149 at p. 3, 643 So.2d at 367; Lee Hargrave, Matrimonial Regimes, 53 La.L.Rev. 877, 887-888 (1993). See also Due v. Due, 342 So.2d 161 (La.1977). To the extent that proceeds are attributable to a right acquired during the existence of the community through a spouse’s labor, skill, and industry, the proceeds are community in nature. Futch, 26-149 at p. 3, 643 So.2d at 367.
Finally, Mr. Delahaye argues it is inequitable that Ms. Mayfield has the right to simultaneously collect Senior Nylic payments and retirement benefits. The QDRO[8] issued by the trial court with re- *832 spect to Ms. Mayfield’s share of the retirement benefits provides that payments shall begin “as soon as administratively lupossible after the death or retirement of the participant [Mr. Delahaye] or earlier in accordance with the Plan, but solely at the payee’s [Ms. Mayfield’s] option.” (Emphasis added.) By contrast, under the terms of the Nylic contract, Mr. Dela-haye’s Senior Nylic payments will cease upon his retirement. Thus, he is precluded from receiving both at the same time. While Mr. Delahaye concedes Ms. May-field is entitled to her proportionate share of the retirement, he argues the trial court’s judgment allows her to attain double his monthly income, resulting in an inequitable partition of the community.
Normally, a non-employee spouse is entitled to receive benefits from a retirement plan, “if, and when” benefits become payable to the employee spouse. Wright v. Wright, 99-1953, p. 3 (La.App. 1st Cir.11/3/00), 770 So.2d 524, 526. In order to ensure fairness when departing from this rule, the following requirements must first be met: (1) the number of creditable years of service under the plan is determinable; (2) the final average earnings figure of the employee spouse can be computed; (3) the employee spouse is entitled to retire; (4) the non-employee spouse is willing to waive the right to future increases in order to receive immediate benefits; and (5) the court is able to structure the QDRO so that the non-employee spouse will receive no greater benefits than she would receive if required to wait until the employee spouse retires. Wright, 99-1953 at p. 3, 770 So.2d at 526; Halverson v. Halverson, 589 So.2d 1153 (La.App. 5th Cir.1991), writ denied, 600 So.2d 655 (1992).
The record does not establish whether these requirements were met in this case. Under these circumstances, we cannot determine whether the trial court erred in structuring the QDRO to allow Ms. May-field the right to begin drawing retirement benefits immediately if permitted by the retirement plan. Accordingly, this matter will be remanded to the trial court, which is ordered to hold a hearing to determine whether the requirements delineated in Wright and Halverson are present in this case. If the trial court determines these requirements are met, it 11fishall amend the QDRO so that Ms. Mayfield is not entitled to share in any future increases in retirement benefits and to ensure that she will receive no greater benefits than if she had been required to wait until Mr. Delahaye retired to draw retirement benefits. If the trial court determines these requirements are not met, it is ordered to amend the QDRO to delete the language allowing Ms. Mayfield the right to begin receiving benefits immediately if so permitted by the retirement plan. In all other respects, these assignments of error are without merit.
Assignment Of Error Number Three
The trial court awarded Ms. Mayfield legal interest on her share of each Senior Nylic payment received by Mr. Delahaye between the termination of the community and April 2001 from the date each respective payment was received by him. On appeal, Mr. Delahaye argues no interest was due on these payments until they were determined by judgment to be community property. In response, Ms. Mayfield con *833 tends the prejudgment interest was part of her reimbursement claim, since Mr. Dela-haye deprived her of the use of these community funds.
In Reinhardt v. Reinhardt, 99-0723, p. 6 (La.10/19/99), 748 So.2d 423, 426, the Supreme Court held interest on an equalizing payment is not due until the date of the partition judgment, even when a substantial portion of the payment is attributable to a reimbursement claim. The court reasoned that, because of the conflicting claims of the parties and the contingencies involved in determining whether those claims will be recognized, both equalizing payments and reimbursement claims are not ascertainable and due until they are recognized by a judgment of partition. Reinhardt, 99-0723 at p. 6, 748 So.2d at 425-427.
The present situation is analogous to Reinhardt. The parties herein strenuously disputed the proper classification of the Senior Nylic payments. This matter also involved other disputed assets and several reimbursement claims between the parties, with each found to owe reimbursement to the other for various items. Given these circumstances, we do not believe any portion of the amount |1(iMr. Delahaye was eventually ordered to pay to Ms. Mayfield (which included sums for an equalizing payment, reimbursement claims, and an accounting) was ascertainable until it was recognized by the partition judgment. Thus, applying the rationale of Reinhardt, interest should have been awarded only from the date of judgment, because the amount owed was not ascertainable and due until that date. See Reinhardt, 99-0723 at pp. 4-7, 748 So.2d at 425-27. See also Howes v. Howes, 93-2366, p. 10 (La. App. 4th Cir.5/26/94), 637 So.2d 1282, 1289.
Ms. Mayfield relies on Palmer v. Palmer, 29,495 (La.App.2d Cir.5/7/97), 693 So.2d 1226, in arguing prejudgment interest was properly awarded. In that case, the plaintiff was awarded one-half of all mineral royalties payments received by her former husband during the pendency of the partition proceedings, with interest on her share of each payment from the date of its receipt. In reaching this holding, the court stated:
The issue of interest which these mineral revenues could have earned is properly viewed as Ms. Palmer’s damages under La. C.C. art.2000 for the delay which she suffered for Mr. Palmer’s refusal to recognize her ownership in the mineral interests and to pay her for the revenues derived therefrom. The critical fact is that Mr. Palmer received the co-owned revenues or “products” during the pendency of an action in which he ultimately did not prevail. Palmer, 29,-495 at p. 4, 693 So.2d at 1228-29.
We do not agree with this rationale. Louisiana Civil Code art.2000 authorizes an award of prejudgment interest from the time the sum is due when the object of the performance is a sum of money.[9] In this case, the amount of each monthly Senior Nylic payments was known. However, due to the numerous contingencies involved in resolving the conflicting claims, the amount ultimately owed by Mr. Dela-haye was not ascertainable and due until it was recognized in the partition judgment. The trial court erred in awarding prejudgment interest.
| ^Assignment Of Error Number Four
While conceding Ms. Mayfield is entitled to a proportionate interest in his retire *834 ment benefits as of April 26, 1999, Mr. Delahaye argues the trial court erred in awarding her a share in future increases in these benefits. He asserts these increases are based solely on his post-termination efforts, skill, and industry in which she has no right to share. Additionally, he contends the trial court failed to adjust Ms. Mayfield’s proportionate share to account for changes in the distribution of benefits between the qualified and non-qualified portions of the plan, since the qualified portion will continue to increase the longer he remains with the company.
The retirement plan is a combination qualified/non-qualified plan. The plan allows an agent’s benefits to naturally increase over the time he is with the company. However, under the “Best of All Worlds” calculation, if his Senior Nylic payments at the time of retirement are greater than the benefits he is entitled to under the qualified plan, the difference will be paid from the non-qualified excess plan, so that his total retirement benefits are equal to the Senior Nylic payments he was receiving. Thus, the amount to be paid under each portion of the plan varies depending on an agent’s length of service and the amount of Senior Nylic payments he is receiving at the time of retirement.
In the QDRO issued by the trial court, Ms. Mayfield was awarded the following interest:
A 50% interest as of April 26, 1999, in the NYLIC Retirement Plan and NYL-IC Excess Plan ... standing in the name of Michael T. Delahaye ... which community share as of April 26, 19999, shall be calculated pursuant to the New York Life Retirement Plan for Agents and the NYLIC Excess Plan “Best of All Worlds” calculation would be approximately $16,441.09 per month as of the date of this judgment (100%) and accordingly, the share of said amount shall be paid to Mary Jo Delahaye monthly pursuant to the provisions of the paragraph shall be a combined benefit of approximately $8,220.54 per month, if it were payable today, but which figure shall be adjusted hereafter in accordance with this order; [Mary Jo Dela-haye] shall also receive her 50% share as above calculated, of any proportional interest ... and to any and all costs of living increases (prorate) ... l1sand any and all other increases attributable to her share due to subsequent increases in Sr. NYLIC as they relate to her community interest and the “Best of All Worlds” calculation ....
Based on our examination of the language of this order, we find no merit in Mr. Delahaye’s contentions, which appear to be based on the erroneous assumption that Ms. Mayfield will share in all future increases in his retirement benefits. The trial court awarded her a share of only those increases attributable to her community interest. She is not entitled to any portion of the increases attributable to policies sold post-termination. Additionally, we believe the QDRO properly accounts for the potential change in distribution of benefits between the qualified and non-qualified plans, since it specifically provides that Ms. Mayfield’s share, including any future increases, should be calculated pursuant to the “Best of All Worlds” calculation.
Assignment Of Error Number Five
Finally, Mr. Delahaye argues the trial court erred in excluding several charts summarizing income to expense ratios for his insurance agency, and the testimony of his CPA, Kenneth Daigrepont, based on the charts. He maintains he was entitled to introduce this evidence under La. C.E. art. 1006, which provides that “otherwise admissible voluminous writings, record *835 ings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.” He claims the excluded evidence was critical to establish Ms. May-field’s share of the Senior Nylic payments should be reduced to account for the fact that 72% of his post-divorce expenses are directly related to maintaining the existing policies.
During direct examination of Mr. Daig-repont, counsel attempted to introduce charts prepared by the witness that summarized income to expense ratios for Mr. Delahaye’s insurance agency. When opposing counsel objected because he had never before seen the charts, counsel for Mr. Delahaye first responded, “I thought I’d get away with it.” He then argued he was not required to provide | ^opposing counsel with copies of the charts because they merely included calculations based on income taxes returns previously provided in discovery. The trial court refused to admit the charts or allow Mr. Daigrepont to utilize them since the charts were not listed on the pre-trial order and opposing counsel had no opportunity to prepare for cross-examination on them. The court indicated Mr. Daigrepont could testify using the tax returns from which the calculations were derived. However, counsel chose to instead proffer the charts and Mr. Daigre-pont’s related testimony in the form of a deposition.
The pre-trial order controls the subject and course of an action unless modified at trial to prevent manifest injustice. Much discretion is left to the trial judge in determining whether to modify the pre-trial order. Harper v. State Farm Mutual Automobile Insurance Company, 484 So.2d 737, 740 (La.App. 1st Cir.), writ denied, 489 So.2d 246 (La.1986). A trial court’s evidentiary rulings will not be disturbed on appeal absent a clear abuse of that discretion. Roberts v. Owens-Corning Fiberglas Corp., 03-0248, p. 18 (La. App. 1st Cir.4/02/04), 878 So.2d 631, 646.
Our review of the record reveals no abuse of discretion. Counsel offered no explanation for failing to list the charts as exhibits in the joint pretrial order or adding them through amendment prior to trial. Further, there has been no showing that Mr. Delahaye was prejudiced by the exclusion of this evidence. The trial court allowed counsel the opportunity to pursue his line of questioning using the tax returns, rather than the charts, but counsel chose not to do so. Regardless, to establish he was entitled to more than 50% of the Senior Nylic payments due to expenses he incurred post-termination, Mr. Dela-haye was required to show, not merely the amount of expenses incurred and their ratio to his income, but specifically that the expenses were expended to service a community asset. See Futch, 26-149 at p. 6, 643 So.2d at 368. Evidence of income to expense ratios, without any delineation between expenses incurred for community policies and 120those incurred for new policies or to generate new business, would have been of little, if any, value to the trial court. Accordingly, the trial court did not abuse its discretion in disallowing this evidence.
CONCLUSION
For the above reasons, the trial court judgment is amended to delete the award to Ms. Mayfield of prejudgment interest on her one-half share of each Senior Nylic payment received by Mr. Delahaye from May 1999 through March 2001. Further, this matter is remanded to the trial court with instructions to hold a hearing in accordance with the views expressed herein. The judgment of the trial court is affirmed in all other respects.
*836 AFFIRMED IN PART; AMENDED IN PART; AND REMANDED WITH ORDER.

. Ms. Mayfield's right to resume use of her maiden name was acknowledged in the divorce judgment.

. A small portion of the monthly payments was attributable to policies sold by Mr. Dela-haye prior to the marriage of the parties. That portion was designated as his separate property.

. Mr. Huber explained that "rescinded” meant that New York Life refunded the full premium to the policyholder and the agent returned any compensation he received from New York Life for the policy.

. Mr. Huber stated that a "lapsed” policy is one that, although it remained in force through the pertinent milestone date under the Nylic calculation formula, it is no longer a premium-paying policy.

. The lapse or non-renewal of a policy will not always affect even a future increase, since the increases are based on the amount and persistency of policies obtained in specific years designated in the Nylic contract. For example, the increase due at the beginning of an agent’s 31st Nylic year is based on his performance in Nylic years 21-30, the increase in the 36th Nylic year is based on Nylic years 26-35, and so on. Thus, in calculating the increase due at the beginning of an agent's 36th year, only the lapse or non-renewal of a policy originally obtained in Nylic years 26-35 will affect the increase. If the policy was originally obtained in Nylic years 1-25, its lapse or non-renewal will have no effect.

. We likewise find no merit in Mr. Delahaye's assertion that the trial court committed legal or manifest error in referring to the Senior Nylic payments in the prior ruling as renewal commissions. Both parties filed motions for new trial from that ruling. In rendering judgment after trial, it is clear the trial court recognized that the Senior Nylic payments were distinct from renewal commissions, since it made separate disposition of the Senior Nylic payments and of the renewal commissions. The record reflects the trial court’s judgment was based on its conclusion that the Senior Nylic payments were attributable to Mr. Delahaye's efforts, skill, and industry during the existence of the community, rather than after its termination.

. The trial court held the portion of the payments attributable to policies sold before the parties' marriage was Mr. Delahaye’s separate property.

. Ms. Mayfield argues the instant appeal does not include the QDRO dealing with retirement benefits, because Mr. Delahaye did not appeal it. We disagree. Since the QDRO was specifically incorporated in the judgment as an attachment, we believe the QDRO was included in the appeal of the partition. Further, the QDRO was rendered to facilitate the partition and was signed on that same date. Appeals are favored in the law. Fraternal *832 Order of Police v. City of New Orleans, 02-1801, p. 2 (La.11/8/02), 831 So.2d 897, 899. Under these circumstances, the QDRO can be reviewed in the instant appeal. Cf. Seivers v. Epoch Well Logging, Inc., 03-0282, p. 3, n. 4 (La.App. 1st Cir. 12/31/03), 868 So.2d 732, 734 n. 4, writ denied, 04-0314 (La.4/2/04), 869 So.2d 892; dela Vergne v. dela Vergne, 99-0364, p. 3 (La.App. 4th Cir. 11/17/99), 745 So.2d 1271, 1273.

. We note that the Supreme Court specifically held in Reinhardt that La. C.C. art. 2000 was not applicable to reimbursement claims. Reinhardt, 99-0723 at p. 6, n. 1, 748 So.2d at 426 n. 1.