NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 CA 0858

KELLY O. ORGERON

VERSUS

EDWARD J. ORGERON, JR.

*Judgment Rendered:* APR 2 6 2024

* * * * * * * *

Appealed from the
22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Case No. 2020-11929, Division K

The Honorable Patrice W. Oppenheim, Judge Presiding

* * * * * * * *

Robert C. Lowe
Paula H. Lee
New Orleans, Louisiana

Counsel for Plaintiff/Appellant
Kelly L. Orgeron

Randall A. Smith
Andre M. Stolier
New Orleans, Louisiana
    and
Karen D. Downs
Natalie C. Neale
Baton Rouge, Louisiana
    and
Frank P. Tranchina
Covington, Louisiana

Counsel for Defendant/Appellee
Edward J. Orgeron, Jr.

* * * * * * * *

BEFORE: THERIOT, PENZATO, AND GREENE, JJ.

**THERIOT, J.**

Kelly L. Orgeron appeals the 22nd Judicial District Court's March 27, 2023 amended judgment, which amended its December 8, 2022 judgment relating to community property. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Appellant, Kelly L. Orgeron ("Kelly"), and Appellee, Edward J. Orgeron, Jr. ("Ed"), were married on February 19, 1997. The parties physically separated on February 24, 2020. On February 26, 2020, Ed filed a petition for divorce in East Baton Rouge Parish Family Court. On April 28, 2020, the Family Court signed a judgment decreeing separation of property, terminating the community of acquets and gains between the parties retroactively to February 26, 2020, the date Ed filed his petition for divorce.

Also on April 28, 2020, Kelly filed a "Petition for Spousal Support and Other Relief; and Petition for Partition of Community Property" in the 22nd Judicial District Court in St. Tammany Parish.[1] On March 24, 2021, the trial court signed a consent judgment which settled most of the parties' community property issues. On April 26, 2021, the trial court signed a consent judgment awarding interim spousal support to Kelly.

The remaining issues proceeded to trial on August 11, 2022 and September 29, 2022. The following issues were contested: (1) Kelly's claim to an interest in certain contracts between Ed and his employer, Louisiana State University ("LSU"), in 2020 and 2021, including a Binding Term Sheet ("BTS") executed in January 2020, prior to Ed filing for divorce; an employment agreement executed in April 2020 ("the 2020 Employment Agreement"); an employment agreement

---

[1] In response, Ed filed a declinatory exception of lis pendens and motion for transfer, arguing that the matter should be litigated in East Baton Rouge Parish. On October 14, 2020, the trial court in the St. Tammany Parish proceeding denied Ed's declinatory exception of lis pendens but granted his motion for transfer and transferred the matter to East Baton Rouge Parish. Both parties applied for supervisory writs. On January 25, 2021, this Court reversed the portion of the October 14, 2020 judgment transferring Kelly's claims for spousal support and partition of community property to East Baton Rouge Parish. As a result, Kelly's claims for spousal support and partition of community property proceeded in St. Tammany Parish.

2

executed in October 2021 ("the 2021 Employment Agreement"); and a termination agreement executed in October 2021 ("the 2021 Termination Agreement"); (2) Kelly's claim to an interest in funds received by My 3 Tiger Boyz, LLC;[2] and (3) Kelly's claim to a community interest in two separate commercial agreements involving St. Joseph Hospice, LLC ("St. Joseph") and executed in December 2019 and March 2020 respectively.

On December 8, 2022, the trial court signed a judgment wherein it ruled that (1) Kelly had no interest in the 2020 Employment Agreement, the 2021 Employment Agreement, or the 2021 Termination Agreement, nor was she entitled to an award of any sum related thereto; (2) Kelly had no community interest in My 3 Tiger Boyz, LLC or any funds received by My 3 Tiger Boyz, LLC from the 2020 Employment Agreement or the 2021 Termination Agreement;[3] (3) Kelly had a community interest in the December 2019 contract with St. Joseph (the "2019 St. Joseph Contract"); and (4) Kelly had no community interest in the March 2020 contract with St. Joseph (the "2020 St. Joseph Contract").

In its written reasons for judgment, the trial court noted that, although the BTS was signed prior to Ed filing for divorce, the BTS was subject to the LSU Board of Supervisor's ("the Board") approval, which was not given until after the community had been terminated. The trial court found that because the BTS and subsequent long-form employment agreement were not approved by the Board until after the termination of the community regime, the rights conferred by the BTS were Ed's separate property. The trial court further found that the BTS was both conditioned upon the execution of a long-form employment agreement and

---

[2] My 3 Tiger Boyz, LLC is an entity Ed formed shortly after filing for divorce. This LLC has four members, Ed and the parties' three sons. My 3 Tiger Boyz, LLC replaced an existing community entity, "O" The Rosy Finch Boyz, LLC, which only had two members – Ed and Kelly.

[3] The trial court further found that Ed was within his right under "O" The Rosy Finch Boyz, LLC's Operating Agreement to resign and replace that LLC with another entity in a subsequent contract. Kelly does not contest this finding on appeal.

3

superseded by the 2020 Employment Agreement entered into by Ed and LSU on April 23, 2020 and approved by the Board on the same date.

Regarding the various employment agreements, the trial court noted that each respective contract required Ed to continue working and performing. As a result, the trial court concluded that these contracts were not an award for past work. The trial court further pointed out LSU's decision to terminate Ed less than three years after winning a national championship, which supports Ed's assertion that the contracts were for payment of Ed's future services to LSU, rather than those contracts being a "reward," as alleged by Kelly.

The trial court also addressed Kelly's equity argument, wherein she claimed entitlement to the value of the agreement earned as a result of community effort and labor expended in their acquisition. The trial court acknowledged that Kelly had emotionally supported Ed and sacrificed her own career for the benefit of the family and/or Ed's career path, but also pointed out that Kelly did not financially contribute to Ed's education or training. The trial court further noted that Kelly has shared in the property acquired and compensation received during the marriage and has had the opportunity to share Ed's enhanced income, even if it was not his maximum income.

The trial court concluded that it had received no evidence to rebut the presumption that payments made under the 2019 St. Joseph Contract were community property. Conversely, the trial court further noted that Kelly had failed to present evidence to establish that any funds were paid or any work was performed prior to March 15, 2020, the date the 2020 St. Joseph Contract was signed. Because of the presumption of community and the lack of evidence, the trial court found that only the 2019 St. Joseph Contract was community property.

On March 23, 2023, the parties filed a joint motion and order to amend the December 8, 2022 judgment pursuant to La. Code Civ. P. art. 1951, asserting that the judgment lacked proper decretal language. The parties jointly submitted a proposed judgment that would add the appropriate decretal language without altering the substance of the judgment. The trial court signed the amended judgment on March 27, 2023. Kelly appeals the amended judgment.[4]

## ASSIGNMENTS OF ERROR

Kelly assigns the following as error:

(1) The trial court erred legally when it held that Kelly was attempting to expand the definition of community property.

(2) The trial court erred legally by ignoring the plain language of the BTS, in violation of Louisiana Civil Code arts. 2046, and 2047 in finding that it was not binding, and also by ignoring the BTS's language and misinterpreting the law on the BTS's conditions. The trial court also erred in not considering the testimony concerning the BTS's origin.

(3) Because the BTS was community property, the trial court committed legal error in ignoring the community interest in the other contracts that flowed from it.

(4) The trial court committed legal error by shifting the burden of proof to Kelly to prove that the BTS/Contracts were community property. The burden was Ed's to prove separateness and he did not meet it.

(5) The trial court committed legal error by reframing Kelly's equity argument as a claim under Louisiana Civil Code art. 121. The trial court further erred regarding her equity argument by refusing to follow Louisiana Civil Code art. 2055 and *Ross v. Ross*, 2002-2984 (La. 10/21/03), 857 So.2d 384.

(6) The trial court committed legal error in [finding] that Kelly had no interest in the funds from the 2020 contract with St. Joseph Hospice, LLC, which were payable for work during the community.

## STANDARD OF REVIEW

---

[4] Pursuant to Louisiana Code of Civil Procedure article 1951, on motion of any party, a final judgment may be amended at any time to alter the phraseology of the judgment or to correct deficiencies in the decretal language. A hearing is not required if all parties consent. A final judgment may not be amended under La. Civ. P. art. 1951 to change its substance. See La. Code Civ. P. art. 1951. In the instant case, the changes resulting in the amended judgment were not substantive. The only additions to the amended judgment were brief clarifications of the procedural posture of the case and the decretal language missing from the original judgment. Accordingly, the trial court's amendment was proper pursuant to La. Code Civ. P. art. 1951 and the March 27, 2023 amended judgment is valid and properly before this court on appeal. See La. Code Civ. P. art. 1951; see also *Barges Unlimited Inc. v. Morgan City Stevedores, LLC*, 2022-0691 (La. App. 1 Cir. 2/2/23), 367 So.3d 736, 745-46.

It is well settled that a trial court has broad discretion in adjudicating issues raised by divorce and partition of the community. A trial court is afforded a great deal of latitude in arriving at an equitable distribution of the assets between the spouses. *Benoit v. Benoit*, 2011-0376 (La. App. 1 Cir. 3/8/12), 91 So.3d 1015, 1019. A trial court's factual findings and credibility determinations made in the course of valuing and allocating assets and liabilities in the partition of community property may not be set aside absent manifest error. *Cosman v. Cosman*, 2022-0694 (La. App. 1 Cir. 1/10/23), 360 So.3d 892, 896, writ denied, 2023-00299 (La. 5/2/23), 359 So.3d 1272. Further, a trial court's finding regarding the nature of property as being either community or separate is a factual determination subject to the manifest error/clearly wrong standard of review. *Cosman*, 360 So.3d at 896.

The trial court's allocation or assigning of assets and liabilities in the partition of community property is reviewed under the abuse of discretion standard. In community property partitions, the trial court is granted much discretion in valuing and allocating assets and liabilities and is required to consider the source and nature of each asset or liability, the financial situation of each spouse, and any other relevant circumstances. *Cosman*, 360 So.3d at 896.

## DISCUSSION

Burden of Proof[5]

We first address which party bears the burden of proof as it relates to the classification of the BTS and any subsequent agreements as community or separate property. During the existence of the community, each spouse owns an undivided one-half interest therein. See La. Civ. Code art. 2336; *Delahaye v. Delahaye*, 2004-0310 (La. App. 1 Cir. 12/30/04), 936 So.2d 822, 827. There is nothing more fundamental in our law than the rule of property which declares that this community is a partnership in which the husband and wife own equal shares, their

---

[5] Arguments on this issue are set forth in Kelly's fourth assignment of error.

title thereto vesting at the very instant such property is acquired. (Emphasis added.) *Louisiana State Employees' Ret. Sys. (Lasers) v. McWilliams*, 2006-2191 (La. 12/2/08), 996 So.2d 1036, 1042, quoting *Messersmith v. Messersmith*, 229 La. 495, 507, 86 So.2d 169, 173 (1956).

Accordingly, property of married persons is generally characterized as either community or separate. See La. Civ. Code art. 2335; *Corkern v. Corkern*, 2005-2297 (La. App. 1 Cir. 11/3/06), 950 So.2d 780, 785. Louisiana Civil Code article 2338 provides in pertinent part that community property comprises of property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse. Property which comes into the possession of a spouse during the community regime is presumed to be community, regardless of the source. See La. Civ. Code art. 2340; *Lanza v. Lanza*, 2004-1314 (La. 3/2/05), 898 So.2d 280, 290. The spouse seeking to rebut the presumption bears the burden of proving the property is separate in nature. *Corkern*, 950 So.2d at 785.

In this case, as it relates to the various forms of income which came into Ed's possession after the termination of the community regime, there is no presumption of community. See La. Civ. Code art. 2340; *Lanza*, 898 So.2d at 290. While Kelly argues that some portion of this income was a reward for work done during the existence of the community, the presumption of community found in La. Civ. Code art. 2340 applies only to "[t]hings in the possession of a spouse during the existence of a regime of community of acquets and gains[.]" Therefore, Kelly has the burden of proving, by a preponderance of the evidence, which portion of Ed's post-community income was due to Ed's effort, skill, or industry exerted during the community. See *Lanza*, 898 So.2d at 290-91.

Classification of the BTS[6]

Kelly argues that the trial court erred in finding the BTS, which she asserts was earned, worked for, and effective during the community, to be Ed's separate property. To the extent that a right to receive proceeds derives from a spouse's labor and industry <u>during the existence</u> of the community, that right is a community asset, even if the proceeds are received after dissolution of the community. (Emphasis added.) <u>See</u> La. Civ. Code arts. 2338 and 2369.2; *Delahaye*, 936 So.2d at 827. Accordingly, we must determine whether the funds paid to Ed pursuant to the agreements at issue were derived from Ed's labor and industry during the existence of the community.

Relevant to this determination is the issue of whether the BTS is binding. Kelly argues that the BTS is binding based on the language of its provisions. She further argues that the BTS included suspensive conditions which, once met, resulted in the 2020 Employment Agreement being retroactive to January 14, 2020, when the community regime still existed. Ed argues in response that the BTS was not effective (and thus not "acquired") until approved by the Board on March 6, 2020, after the community ended. Ed further argues that the BTS itself imposed no obligation on LSU to pay Ed but merely obligated both parties to negotiate in good faith.

Generally, legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. <u>See</u> La. Civ. Code art. 1983; *Waterworks Dist. No. 1 of Desoto Par. v. Louisiana Dep't of Pub. Safety & Corr.*, 2016-0744 (La. App. 1 Cir. 2/17/17), 214 So.3d 1, 5, <u>writ denied</u>, 2017-0470 (La. 5/12/17), 219 So.3d 1103. Interpretation of a contract is the determination of the common intent of the parties. La. Civ. Code art. 2045. In other words, a contract between *the parties is*

---

[6] Arguments on this issue are set forth in Kelly's first, second, and third assignments of error.

8

the law between them, and the courts are obligated to give legal effect to such contracts according to the true intent of the parties. *Waterworks Dist. No. 1 of Desoto Par.*, 214 So.3d at 5. To the extent we must interpret the agreements at issue, we apply the *de novo* standard of review. Conversely, where no contract provision applies or where factual findings are pertinent to the interpretation of the contract, we apply the manifest error standard of review. *Boone Servs., LLC v. Clark Homes*, Inc., 2023-0299 (La. App. 1 Cir. 10/18/23), 377 So.3d 304, 311.

The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself and is not assumed. *Waterworks Dist. No. 1 of Desoto Par.*, 214 So.3d at 5. Where the words of a contract are clear, explicit and lead to no absurd consequences, the meaning and intent of the parties must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence.[7] *Waterworks Dist. No. 1 of Desoto Par.*, 214 So.3d at 5.

Common intent is determined, therefore, in accordance with the general, ordinary, plain, and popular meaning of the words used in the contract. Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties. *Waterworks Dist. No. 1 of Desoto Par.*, 214 So.3d at 5. Most importantly, the words of a contract must be given their generally prevailing meaning. La. Civ. Code art. 2047; *Waterworks Dist. No. 1 of Desoto Par.*, 214 So.3d at 5.

With these legal precepts in mind, we turn to the language of the BTS. The BTS was signed by Ed and Scott Woodward, LSU's Athletic Director, on January

---

[7] Although Kelly argues that the trial court erred in not considering the testimony concerning the BTS's origin, the language of the BTS is clear, explicit, and leads to no absurd consequences. Accordingly, the meaning and intent of the parties must be sought within the four corners of the BTS and cannot be explained or contradicted by parol evidence. See *Waterworks Dist. No. 1 of Desoto Par.*, 214 So.3d at 5.

9

23, 2020, prior to the termination of the community. The BTS included the following pertinent information: (1) a term effective as of January 14, 2020 and ending December 31, 2025; (2) a salary amount of $6,000,000, which consisted of base salary and supplemental compensation; (3) terms relating to a life insurance policy; (4) clauses relating to Ed and LSU's termination options; and (5) a miscellaneous section, which provided:

> **Miscellaneous:** This is a legally binding Term Sheet and shall be enforced and construed in accordance with the laws of Louisiana, subject to approval by the LSU Board of Supervisors. Any civil action to enforce this Term Sheet shall be brought in a state or federal court having subject matter and personal jurisdiction over the parties in East Baton Rouge Parish, Louisiana. The parties agree and acknowledge that they will negotiate in good faith and to finalize a long-form Employment Agreement that includes the terms set forth above, all non-conflicting terms of [Ed's] existing Employment Agreement, and other terms which are customary in Division 1-A head coach contracts **within 90 days** of this Term Sheet unless such period is extended by mutual agreement of the Parties, and that <u>the successful negotiation and execution of such long-form Employment Agreement is a condition of this Term Sheet and continued employment. Upon execution and approval by the LSU Board of Supervisors, the long-form Employment Agreement will supersede the terms of this Term Sheet, but until that occurs, this Term Sheet remains in full force and effect.</u> (Emphasis added.)

As pointed out by Ed, the BTS obligated Ed to negotiate in good faith with LSU and to finalize a long-form employment agreement within 90 days, unless the parties mutually agreed to extend that time frame. Accordingly, although the BTS was signed during the existence of the community, the purpose of the BTS was to facilitate the finalization of a formal long-form employment agreement (here, the 2020 Employment Agreement). The 2020 Employment Agreement, once executed and approved by the Board on April 23, 2020, then superseded the BTS. Because the 2020 Employment Agreement was approved by the Board on April 23, 2020, after the termination of the community regime, we find that the trial court did not abuse its discretion when it classified the income stemming from the 2020

Employment Agreement as Ed's separate property. See Cosman, 360 So.3d at 896.

Regarding Kelly's argument that the agreements were rewards for Ed's work during the marriage, we note that the BTS and the subsequent 2020 Employment Agreement obligated Ed to continue working as head football coach at LSU. The 2020 Employment Agreement (and the subsequent 2021 Employment Agreement) specifically required Ed to administer, manage, and lead the football program at LSU; hire, fire, and manage coaches and other staff; perform all duties reasonably assigned to him by LSU's Athletic Director; and promote and monitor the success of the football team and its student-athletes both athletically and academically. Each of these requirements clearly constitutes future work.

Further, the 2021 Termination Agreement provided for payments in exchange for the execution of the termination agreement and acceptance of its terms "in lieu of payments for [Ed's] future personal services as head football coach[.]" Ed also agreed to make local public appearances on behalf of LSU upon LSU's request; to allow LSU to use his name and approved likeness in media, advertising, and promotional materials; to not become employed or serve as a head coach for any collegiate football program in the Southeastern Conference; and to cooperate with LSU in any investigation. Each of these responsibilities also constitutes future work.[8]

As to the 2021 Termination Agreement, this Court has held that severance pay cannot be considered to be acquired until such time as the employee may be involuntarily terminated, if ever. In other words, if the wages would have been separate property, then the severance pay must be considered separate. Kees v. Kees, 509 So.2d 189, 191 (La. App. 1 Cir. 1987). Because the income stemming from the employment agreements is Ed's separate property, the termination

---

[8] Further, while Ed did receive incentive payments during the marriage as a result of his coaching successes, Kelly stipulated at trial that she received her portion of those incentive payments.

11

payments are also his separate property. We find no abuse of discretion in the trial court's classification of the termination payments as Ed's separate property. See *Cosman*, 360 So.3d at 896.

Kelly further argues that the obligations imposed by the BTS (approval of the BTS, negotiation and execution of a long-form agreement, and approval by the Board) constituted suspensive conditions. She asserts that the fulfillment of those conditions, despite occurring after the termination of the community regime, made the 2020 Employment Agreement retroactive to January 14, 2020, the date the BTS was signed.

A conditional obligation is one dependent on an uncertain event. If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive. La. Civ. Code art. 1767; *Hampton v. Hampton, Inc.*, 97-1779 (La. App. 1 Cir. 6/29/98), 713 So.2d 1185, 1190. The right to enforce the obligation does not arise until the fulfillment of the suspensive condition, and the obligation may not be enforced until the condition is met. Courts do not construe stipulations in a contract as suspensive conditions unless the express contract language compels such construction. *Hampton*, 713 So.2d at 1190. Fulfillment of a condition has effects that are retroactive to the inception of the obligation. La. Civ. Code art. 1775.

The BTS states that "the successful negotiation and execution of such long-form Employment Agreement is a condition of this Term Sheet and continued employment." Accordingly, the effectiveness of the BTS and Ed's continued employment at LSU were conditioned upon Ed and LSU's successful negotiation and execution of the 2020 Employment Agreement.

However, the BTS goes on to state that "[u]pon execution and approval by the LSU Board of Supervisors, the long-form Employment Agreement will supersede the terms of this Term Sheet, but until that occurs, this Term Sheet

12

remains in full force and effect." Once the 2020 Employment Agreement was approved by the Board and executed by the parties on April 23, 2020, the 2020 Employment Agreement superseded the BTS. Thus, under the applicable rules of contract interpretation set forth above, and giving the words of the 2020 Employment Agreement their generally prevailing meaning, we conclude that the BTS was not a conditional obligation, but was rather superseded by a new obligation (the 2020 Employment Agreement) that was not retroactive to the date Ed and Mr. Woodward executed the BTS.

Pursuant to Black's Law Dictionary, "supersede" means "[t]o annul, make void, or repeal by taking the place of." SUPERSEDE, Black's Law Dictionary (11th ed. 2019). Accordingly, the execution and Board approval of the 2020 Employment Agreement resulted in that agreement replacing the BTS.[9]

The trial court found that the BTS was akin to an "agreement to agree" rather than a contract Ed could enforce for payment of compensation. Louisiana jurisprudence has recognized that "an agreement to agree is no agreement at all, since either party may avoid it by the mere failure to agree." *NOLA Title Co., L.L.C. v. Archon Info. Sys., LLC*, 2022-0697 (La. App. 4 Cir. 4/13/23), 360 So.3d 166, 178, writ denied, 2023-00682 (La. 9/19/23), 370 So.3d 467, citing *McNeely v. Town of Vidalia*, 157 La. 338, 342, 102 So. 422, 423 (1924). We find no manifest error in the trial court's conclusion that the BTS was simply an agreement to agree. See *First Bank & Tr. v. Fitness Ventures, L.L.C.*, 2017-0475 (La. App. 1 Cir. 12/6/17), 2017 WL 6031783, at *6 (unreported). Further, Ed successfully negotiated a long-form employment agreement, which replaced the BTS.[10]

---

[9] In brief, Ed asserts that Kelly received her one-half community interest in the 2020 Employment Agreement to account for the period of time between January 14, 2020 and February 26, 2020 (43 days). Kelly did not dispute this, nor did she raise an alternative argument seeking judgment in her favor for this limited amount. Additionally, a joint exhibit admitted into evidence by the parties reflects the calculations of a certified public accountant beginning in March 2020. There is no evidence of the monetary amount Kelly purportedly should have received from January 14, 2020 through February 26, 2020.

[10] We further note that the BTS is a one-and-a-half-page document, while the long-form employment agreement consists of twenty-five pages. Although the BTS has many of the parameters that are set forth in the long-form employment agreement, it is not identical to the long-form employment agreement.

13

Accordingly, we agree with the trial court's conclusion that the BTS was superseded by a subsequent agreement executed after the termination of the community. Considering same, we find no manifest error in the trial court's finding that the compensation provided for in the 2020 Employment Agreement (and subsequent 2021 Employment Agreement and 2021 Termination Agreement) is Ed's separate property.

Equity[11]

Kelly further argues that equity dictates that she receive a proportionate share of the BTS and the contracts that flowed from it. Kelly asserts that La. Civ. Code art. 2055 and *Ross v. Ross*, 2002-2984 (La. 10/21/03), 857 So.2d 384, support her position.

Louisiana Civil Code article 2055, which is located within the interpretation of contracts section of the Civil Code, states in pertinent part:

> Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.

In the preceding Civil Code articles, equity is mentioned only as it relates to the interpretation of doubtful contractual provisions or when there is no contractual provision governing a particular situation. See La. Civ. Code arts. 2053 and 2054. There are no ambiguous contractual provisions at issue in this case.

Further, *Ross*, 857 So.2d 384, relates to insurance renewal commissions, which were the result of a husband's effort, skill, or industry during the existence of the community property regime. (Emphasis added). *Ross*, 857 So.2d at 397. Ed's labor at issue here simply occurred after the termination of the community. We further reiterate that Kelly received her portion of the 2019 incentive payments, which were earned prior to the termination of the community.

---

[11] Arguments on this issue are set forth in Kelly's fifth assignment of error.

14

Accordingly, we find that the trial court's disposition of Kelly's equity claims was not manifestly erroneous.

## 2019 St. Joseph Contract[12]

The final contracts at issue are the St. Joseph agreements. In December 2019, Ed and "O" The Rosy Finch Boyz, LLC (at that time the community's LLC) entered into the 2019 St. Joseph Contract. The 2019 St. Joseph Contract was effective November 10, 2019 through July 1, 2022, unless terminated earlier, and required Ed to make certain appearances for St. Joseph.

On March 15, 2020, after the termination of the community regime, Ed signed a new commercial agreement (the "2020 St. Joseph Contract") with St. Joseph wherein he replaced "O" The Rosy Finch Boyz, LLC with My 3 Tiger Boyz, LLC. Aside from changing the LLC named as a party, the two contracts were identical.

Kelly argues that the trial court erred in finding that Kelly had no interest in funds that Ed allegedly received from the 2019 St. Joseph Contract, which Kelly asserts were payable for work during the community. Ed argues in response that Kelly failed to prove that he had actually been paid by St. Joseph for any work performed during the community.

In its written reasons, the trial court noted that Kelly had failed to present evidence to establish that any funds were paid or any work was performed prior to March 15, 2020, the date the 2020 St. Joseph Contract was signed. Although the 2019 St. Joseph Contract provided for bi-annual payments to Ed, the record contains no evidence to establish that any funds were paid or any work was performed by Ed during the community.[13] We agree with the trial court's conclusion that Kelly has a community interest in funds attributable to such work.

---

[12] Arguments on this issue are set forth in Kelly's sixth assignment of error.

[13] When asked at trial whether he received any payments from St. Joseph, Ed responded, "I guess I did." He further testified that he had not looked at the St. Joseph contracts in detail prior to signing.

However, there is simply no evidence to establish that any funds were paid to Ed or that any work was performed by Ed during the community.

## DECREE

For the above and foregoing reasons, we affirm the 22nd Judicial District Court's March 27, 2023 amended judgment, which amended the December 8, 2022 judgment. Costs of this appeal are assessed to Appellant, Kelly L. Orgeron.

**AFFIRMED.**